# 25-1495

# United States Court of Appeals for the First Circuit

STATE OF NEW YORK, et al.,

*Plaintiffs-Appellees,*

v.

LINDA MᴄMAHON, in her official capacity as Secretary of Education, et al.,

*Defendants-Appellants.*

On Appeal from the United States District Court
for the District of Massachusetts

## MEMORANDUM OF LAW FOR STATE APPELLEES IN OPPOSITITION TO MOTION FOR EMERGENCY STAY

ANDREA JOY CAMPBELL
*Attorney General*
*Commonwealth of Massachusetts*
1 Ashburton Place
Boston, Massachusetts 02108
(617) 963-2277

ANNE E. LOPEZ
*Attorney General*
*State of Hawaiʻi*
425 Queen Street
Honolulu, Hawaiʻi 96813
(808) 586-1360

LETITIA JAMES
*Attorney General*
*State of New York*
28 Liberty Street
New York, New York 10005
(212) 416-8014

ROB BONTA
*Attorney General*
*State of California*
300 South Spring Street
Los Angeles, California 90013
(213) 269-6364

*(Complete counsel listing appears on signature pages.)*

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ............................................................... 1

BACKGROUND ................................................................................. 3

    A.   Federal Law Governing the Department of Education ........... 3

    B.   Defendants' Actions to Dismantle the Department ................ 5

    C.   Proceedings in the District Court ......................................... 10

ARGUMENT ...................................................................................... 11

   I.   DEFENDANTS ARE UNLIKELY TO SUCCEED ON THE MERITS OF THEIR APPEAL. ................................................................... 12

    A.   Plaintiff States Have Standing ........................................... 13

    B.   The District Court Properly Exercised Jurisdiction over Plaintiffs' Claims. ..................................................... 15

    C.   The District Court Correctly Found That Defendants' Actions Are Likely Unlawful. ........................................... 18

        1.   Defendants' actions likely violate the separation of powers and the Take Care Clause ........................... 18

        2.   Defendants' actions likely violate the Administrative Procedure Act. .................................... 21

    D.   The Scope of the Preliminary Injunction Is Appropriate. ...................................................................... 23

   II.   THE REMAINING FACTORS WEIGH STRONGLY AGAINST A STAY. .... 25

CONCLUSION ................................................................................... 27

i

## PRELIMINARY STATEMENT

Defendants are not entitled to the "extraordinary remedy," *Nken v. Holder*, 556 U.S. 418, 428 (2009), of a stay pending appeal.[1] Plaintiff States[2] challenge defendants' actions to effectively close the Department of Education without authorization from Congress by reducing the Department's staff to the point that it cannot perform its statutorily mandated functions. Following briefing and argument, the district court (Joun, J.) preliminarily enjoined defendants from taking steps to dismantle the Department—including by enjoining a planned reduction in force (RIF) that would have devastated the Department and by barring the planned transfer of core Departmental functions to other branches of government (the "March 21 Directive"). Because the agency defendants' conduct is unlawful and the district court properly preliminarily enjoined

---

[1] Defendants-appellants are Linda McMahon, in her official capacity as Secretary of Education; the U.S. Department of Education; and Donald J. Trump, in his official capacity as President of the United States. Defendants McMahon and the Department are collectively referred to as the "agency defendants."

[2] Plaintiffs-appellees are the States of New York, Massachusetts, Hawai'i, California, Arizona, Colorado, Connecticut, Delaware, Illinois, Maine, Maryland, Minnesota, Nevada, New Jersey, Oregon, Rhode Island, Vermont, Washington, and Wisconsin; the District of Columbia; and Attorney General Dana Nessel for the People of Michigan.

that conduct, this Court should decline to stay the preliminary injunction pending appeal.

First, defendants are unlikely to succeed on the merits of their appeal. Plaintiff States submitted dozens of unrefuted declarations—including more than two dozen declarations from current and former Department employees—establishing (1) that the RIF would result in the elimination of entire teams responsible for discharging statutory obligations, and (2) that following the Department's dismantling efforts, those statutory obligations were in fact not being discharged. Defendants submitted no evidence to the contrary, nor did they purport to comply with the strict statutory restrictions on the Secretary of Education's authority to restructure the Department. Indeed, defendants barely defend the legality of their actions in this motion, arguing instead that the plaintiff States lack standing, that plaintiffs' claims are precluded by the Civil Service Reform Act, and that defendants' actions are not final for purposes of the Administrative Procedure Act (APA).

Second, the record shows that the Department's actions have already caused irreparable injury to plaintiff States, including by forcing States to divert their own resources to replace diminished federal services

2

that are statutorily required, by disrupting the federal student aid process during the peak time of year for aid applications, and by depriving the States of technical assistance and data needed for resource allocation. By contrast, defendants cannot show irreparable harm from an order that merely ends unlawful action. For similar reasons, the public interest is best served by ensuring that the Department continues to deliver the services it is required to provide, pending this litigation.

## BACKGROUND

### A.    Federal Law Governing the Department of Education

Congress created the Department of Education in 1979. *See* Pub. L. No. 96-88, 93 Stat. 668 (1979) (codified as amended at 20 U.S.C. §§ 3401-3510). The Department is obligated by statute to administer numerous programs, including the federal student aid system, federal grants for higher education, and federal funds for birth-to-grade-12 education. *See* 20 U.S.C. §§ 1070a, 1087a-1087j, 1087-51 to -58, 1070b-1070b-4, 1400-1482, 6301-6577.

The Department must also investigate and enforce various laws in the education context via its Office for Civil Rights, including Title VI of the Civil Rights Act of 1964 (prohibiting discrimination based on race,

color, or national origin), *see* 42 U.S.C. § 2000d; Title IX of the Education Amendments of 1972 (on the basis of sex), *see* 20 U.S.C. §§ 1681-1689; and Section 504 of the Rehabilitation Act of 1973 (on the basis of disability), *see* 29 U.S.C. § 794. In addition, Congress requires that the Department "collect, report, analyze, and disseminate statistical data related to education," including state and local education. 20 U.S.C. § 9543(a)(1).

Congress has restricted the authority of the Secretary of Education to unilaterally alter the Department's functions. *See id.* § 3473. The Secretary may "consolidate, alter, or discontinue" certain enumerated entities, *id.* § 3473(a), but only after giving the appropriate House and Senate oversight committees at least ninety days to evaluate "a full and complete statement of the action proposed to be taken" and the "facts and circumstances" supporting such proposal, *id.* § 3473(b)(2).

Congress has expressly prohibited the Secretary from abolishing other statutory entities within the Department, *see id.* § 3473(a)(2), and from reallocating or discontinuing any functions transferred to the Department from other departments, *see id.* § 3473(a)(1). The Secretary is also prohibited from altering "the delegation of functions" specifically assigned by statute to a "specific organizational entity." *Id.* § 3473(a)(3).

4

And the Secretary's discretion is further limited by Congress's mandate that any reorganization be "necessary or appropriate." *Id.* § 3473(a). As the sponsor of the Department's original enabling legislation noted in 1979, this provision was included to prevent "the administrative elimination of programs." 2 *Legislative History of Public Law 96-88, Department of Education Organization Act* 1800 (125 Cong. Rec. H8597 (Sept. 27, 1979) (remarks of Rep. Brooks)).

## B.     Defendants' Actions to Dismantle the Department

After the 2024 election, President-elect Trump told *Time* magazine that "you can do a lot of things without Congress" to cut the size of the federal government.[3] Offering an example, the President-elect said that he intended to direct "[a] virtual closure of Department of Education in Washington."[4] After his inauguration, President Trump called the

---

[3] Time Staff, *2024 Person of the Year Interview with Time*, Time (Dec. 12, 2024), https://time.com/7201565/person-of-the-year-2024-donald-trump-transcript/. (All websites last visited May 25, 2025.)

[4] *Id.*

Department "a big con job" and stated that he wanted it "closed immediately."[5]

On March 3, which was defendant Linda McMahon's first day as Secretary of Education, she announced "Our Department's Final Mission" in a speech posted to the Department's website. (*See* Ex. 3.[6]) Secretary McMahon stated that the Department would perform "one final, unforgettable public service to future generations of students" (*id.* at 4), and that the changes would "profoundly impact staff, budgets, and agency operations here at the Department" (*id.* at 2).

Eight days after the "Final Mission" speech, the Department announced that it had "initiated a reduction in force (RIF) impacting nearly 50% of the Department's workforce." (Ex. 5, at 1.) The RIF announcement noted that the Department had employed 4,133 workers on Inauguration Day, and that "[a]fter today's actions, the Department's

---

[5] Nandita Bose & Kanishka Singh, *Trump Says He Wants Education Department to Be Closed Immediately*, Reuters (Feb. 13, 2025), https://www.reuters.com/world/us/trump-says-he-wants-education-department-be-closed-immediately-2025-02-12/.

[6] All exhibits cited as "Ex." are exhibits to the Declaration of Nathaniel J. Hyman, ECF No. 71, with page references omitting the cover sheet, except where otherwise noted.

workforce will total roughly 2,183 workers." (*Id.* at 1-2.) The announcement claimed that the Department "will continue to deliver on all statutory programs that fall under the agency's purview," but did not explain how that would be possible given the RIF. (*See id.* at 1.) The announcement stated that the affected employees would be on administrative leave starting March 21, and would leave the Department's payroll on June 9. (*Id.* at 2.)

Employees subject to the RIF received a mass email stating that "your organizational unit is being abolished along with all positions within the unit—including yours." (*See, e.g.,* Ex. 68, Decl. of Doe Declarant 16, Ex. 1, at 1.) The email explained that the terminations were not based on the employees' "performance or contributions," but were part of the Department's "restructuring process." (*See, e.g., id.* at 2.) Immediately after the mass email was sent, affected staff lost the ability to access relevant software on their computers and could no longer send emails outside the Department. (*See, e.g.,* Ex. 51, Decl. of Hamlin ¶ 7.)

The result was a near-immediate cessation of critical and statutorily mandated services. For example, one employee who received a RIF notice was the Department's Acting Performance Improvement Officer, who has

7

provided a declaration as Doe Declarant 21. (Ex. 84 ¶¶ 3-6.[7]) Doe Declarant 21's entire team was abolished by the RIF, and Doe Declarant 21 became concerned that the Department would be unable to meet its obligations under the GPRA Modernization Act of 2010,[8] which requires a Department official to be assigned as Performance Improvement Officer. (*Id.* ¶ 7.) Doe Declarant 21 reached out for a meeting with senior agency officials—including Denise Carter, who served as Acting Secretary of the Department until days before the RIF announcement—and asked how the role of Performance Improvement Officer would be transitioned to others within the Department. Carter told Doe Declarant 21 that the Director of the Budget Service would be designated as the Performance Improvement Officer, but would "oversee the winding down of the work." (*Id.* ¶¶ 10-11.) Carter further explained that "because the Department as an agency was winding down, and would not exist moving forward, it would not be responsible for meeting the statutory functions performed by the Performance Improvement Officer." (*Id.* ¶ 11.)

---

[7] Exhibit 84 is an exhibit to the Second Supplemental Declaration of Nathaniel J. Hyman, ECF No. 124.

[8] Pub. L. No. 111-352 (2011) (government performance and results act).

On March 20, 2025, President Trump signed an Executive Order titled "Improving Education Outcomes by Empowering Parents, States, and Communities." (Ex. 1.[9]) The Executive Order directs that Secretary McMahon "shall, to the maximum extent appropriate and permitted by law, take all necessary steps to facilitate the closure of the Department of Education." (*Id.* § 2(a)).

On March 21, during a press conference, President Trump said he had "decided that the SBA, the Small Business Administration . . . will handle all of the student loan portfolio," and that although administration of student loans is a "pretty complicated deal," the portfolio would be "coming out of the Department of Education immediately."[10] The President also stated that "special needs" and "nutrition programs" would be transferred to the Department of Health and Human Services.[11]

---

[9] Exec. Order No. 14242, 90 Fed. Reg. 13679 (Mar. 25, 2025).

[10] Lexi Lonas Cochran, *Trump Says Student Loans Moving to SBA, 'Special Needs' to HHS*, The Hill (Mar. 21, 2025), https://thehill.com/homenews/education/5207597-trump-student-loans-sba-special-needs-disabled-students-hhs-mcmahon-kennedy/.

[11] *See id.*

**C.    Proceedings in the District Court**

In March 2025, the plaintiff States filed the complaint in this action, alleging that the RIF is "an effective dismantling of the Department" because it is "so severe and extreme that it incapacitates components of the Department responsible for performing functions mandated by statute." (Dist. Ct. ECF No. 1, ¶¶ 3-4.) Plaintiffs alleged that the defendants' actions: (1) violate the separation of powers; (2) violate the Take Care Clause of the Constitution; (3) are ultra vires; and (4) violate the APA as both contrary to law and arbitrary and capricious. (*Id.* ¶¶ 149-195.) On March 24, 2025, plaintiff States moved for a preliminary injunction. (*See* Dist. Ct. ECF Nos. 69-71.)

The district court heard oral argument on April 25, 2025. (*See* Hr'g Tr. (reproduced in the addendum to Defendants' Emergency Motion).) At oral argument, defendants sought to portray the RIF as a "streamlining" of the Department to cut "bureaucratic bloat" that is separate from the President's goal of closing the Department. (*Id.* at 30-32.) Defendants conceded that only Congress can abolish the Department, but when the court asked defendants to point to evidence in the record that "the administration is working on a legislative agenda," defendants pointed only to

the plaintiffs' own declarations and the statements from the President and Secretary therein referring to the goal of closure. (*Id.* at 32.)

In granting plaintiffs' motion, the district court found that "[t]he record abundantly reveals that Defendants' true intention is to effectively dismantle the Department without an authorizing statute." (Mem. & Order at 2 (reproduced in the addendum to Defendants' Emergency Motion).) The court therefore enjoined the agency defendants from carrying out the RIF, and directed them "to restore the Department to the status quo such that it is able to carry out its statutory functions," including by reinstating employees whose employment was terminated by the RIF. (*Id.* at 88.)

## ARGUMENT

To obtain a stay pending appeal, the defendants must: "(1) make a strong showing that they are likely to succeed on the merits in their appeal; (2) show that they will be irreparably injured absent a stay; (3) show that issuance of the stay will not substantially injure the other parties interested in the proceeding; and (4) show that the stay would serve the public interest." *New York v. Trump*, 133 F.4th 51, 65 (1st Cir. 2025) (quotation marks and brackets omitted); *see New Jersey v. Trump*,

131 F.4th 27, 33 (1st Cir. 2025). Of the four factors, the first two—likelihood of success and irreparable injury—"are the most critical." *New York*, 133 F.4th at 66 (quotation marks omitted). Defendants have failed to show that *any* of the four factors favor a stay pending appeal here.

## I.    DEFENDANTS ARE UNLIKELY TO SUCCEED ON THE MERITS OF THEIR APPEAL.

Defendants primarily raise threshold jurisdictional and reviewability arguments. Contrary to defendants' contention, plaintiffs have standing, and the Civil Service Reform Act (CSRA) does not bar plaintiffs' claims. In response to the merits of plaintiffs' claims, defendants argue that they have not engaged in a reviewable agency action, but do not even attempt to rebut plaintiffs' showing that their actions are contrary to law and arbitrary and capricious. And although defendants dispute the scope of the injunction, they do not propose alternative relief to redress plaintiffs' injuries.

A.     **Plaintiff States Have Standing.**

A State has standing to challenge a federal official or agency's conduct if the State has suffered "a concrete and imminent harm to a legally protected interest . . . that is fairly traceable to the challenged conduct and likely to be redressed by the lawsuit." *Biden v. Nebraska*, 600 U.S. 477, 489 (2023).

Here, the district court correctly found that the States have standing because they "have already experienced delays and disruptions" in receiving funding because of the RIF. (Mem. at 38.) Among other things, state universities have already experienced delays and nonresponses from the Department, including a lack of responses needed to complete recertification to receive aid. (*See, e.g.,* Ex. 40.) Universities have also observed a significant drop in completion rates for the Free Application for Federal Student Aid (FAFSA) for students and families, and a significant decline in customer support from the Department's FAFSA call center. (Ex. 26 ¶ 34.)

Plaintiffs also demonstrated a high likelihood of imminent harm absent injunctive relief. For example, the States explained below that the Department will be unable to properly calculate States' Title I funding in

13

the coming academic year because of the effective elimination of the Department entity that collects the data necessary to make such calculations. (Tr. at 19; *see* Ex. 18 ¶ 14.)  In addition, plaintiffs showed that the Department's gutting of the OCR is already causing a surge in demand on state officials to investigate civil rights complaints that the Department cannot investigate due to the RIF. (Ex. 22 ¶ 15.)

Defendants do not acknowledge the district court's factual findings with respect to standing, or the overwhelming record evidence of pecuniary and sovereign injuries submitted by plaintiffs. Instead, defendants argue that plaintiffs are impermissibly seeking to vindicate "an abstract and generalized grievance" about the separation of powers. Mot. at 11. Defendants' characterization of plaintiffs' injury is simply wrong.

Defendants are also wrong to argue that plaintiffs' injuries are not redressable.[12] Mot. at 12. The sole case defendants cite for this proposi-

---

[12] Indeed, defendants go further, arguing that any attempt to dismantle a federal agency is inherently nonjusticiable. (Mot. at 11.) But that is clearly wrong—taken to its logical conclusion, the federal government could terminate 3,999 of 4,000 employees within a hypothetical agency, assign the remaining employee all of the statutory obligations of the agency, and then argue that courts could not redress the ensuing harm.

tion, *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 346 (2006), pertains to the unique doctrine of taxpayer standing in challenges to state spending actions. Neither that case, nor any other case that plaintiffs are aware of, supports defendants' arguments that plaintiffs categorically lack standing in cases that involve questions about the separation of powers. To the contrary, a plaintiff injured by government action does not forfeit his standing to sue even if an additional "consequence of his prevailing" might be to resolve a question of separation of powers between the political branches. *See INS v. Chadha*, 462 U.S. 919, 935-36 (1983).

## B. The District Court Properly Exercised Jurisdiction over Plaintiffs' Claims.

Contrary to defendants' contention (Mot. at 13-16), the CSRA does not divest federal courts of jurisdiction to hear plaintiffs' claims.

The CSRA requires an administrative body, the Merit Service Protection Board, to hear "a suit brought by employees or unions over employee or union problems." *Maryland v. USDA*, No. 25-cv-748, 2025 WL 973159, at *16 (D. Md. Apr. 1, 2025). The district court correctly concluded that the CSRA does not apply to plaintiffs' claims. (Mem. at 42-45.) Plaintiffs are not asking the court to review the propriety of

employment actions; rather, plaintiffs are challenging defendants' use of mass terminations as a tool to dismantle the Department.

In insisting that the CSRA is relevant here, defendants rely (Mot. at 15) on a summary stay order granted by a divided panel of the Fourth Circuit in the *Maryland* case. *See Maryland v. USDA*, 2025 WL 1073657 (4th Cir. Apr. 9, 2025). But that out-of-circuit decision is not persuasive authority here, for two reasons. First, the majority's order notes that the federal government raised both standing and CSRA-channeling arguments in challenging jurisdiction, but does not specify the basis for the stay—and the majority offers no analysis of the CSRA issue. *Id.* at *1. Second, and in any event, Judge Benjamin's dissent persuasively explains why the Government's CSRA argument was mistaken. *Id.* at *3. As Judge Benjamin shows, the federal government's argument depended upon a faulty premise that the States are trying to vindicate the rights of employees, but the CSRA is no bar when the States are asserting their "separate harms as state *qua* states." *Id.* (quotation marks omitted). Courts in other circuits have since found the dissent in *Maryland* "more robust and more persuasive" than the majority opinion. *See, e.g.*, *American Federation of Govt. Employees, AFL-CIO v. Trump*, 2025 WL 1482511, at

16

*13 (N.D. Cal. May 22, 2025). Indeed, even a district court *within* the Fourth Circuit has construed the stay order narrowly, concluding that it does not bar suits in which the effective shuttering of an agency has affected non-employees' access to statutorily mandated programs. *Wiley v. Kennedy*, 2025 WL 1384768, at *11 (S.D. W.Va. May 13, 2025).

Here too, the States are suing not for the benefit of Department employees, but to prevent their own injuries resulting from the Department's incapacitation. Yet defendants admit (Mot. at 16) that their position is that States can *never* sue over a RIF—even if the RIF injures States, and even if the purpose and effect of the RIF is to make the agency nonfunctional. That goes too far. When a case presents questions that "are fundamental, even existential" about an agency's "structure or very existence," it would be "surprising" to conclude that Congress would have intended the case to be heard before an administrative body—and far more likely that federal district court is the proper venue. *Axon Enter., Inc. v. FTC*, 598 U.S. 175, 180, 189 (2023). Moreover, because the entity to which defendants would channel plaintiffs' claims has "no particular expertise" with respect to the Department of

17

Education's statutory obligations, that entity is not the proper forum. *See Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 214 (1994).

## C. The District Court Correctly Found That Defendants' Actions Are Likely Unlawful.

In their motion, defendants fail to rebut the district court's thorough analysis in concluding that plaintiffs are likely to succeed on the merits.

### 1. Defendants' actions likely violate the separation of powers and the Take Care Clause

The federal government has two elected branches: Congress, which "makes laws," and the President, who "faithfully executes them." *Utility Air Regul. Grp. v. EPA*, 573 U.S. 302, 327 (2014) (quotation marks and brackets omitted). The Constitution vests "[a]ll legislative Powers" in Congress. *See* U.S. Const. art. I, § 1. The executive branch has no authority to enact, amend, or repeal statutes, and under the Take Care Clause, the President must ensure that the laws are faithfully executed. *See Clinton v. City of New York*, 524 U.S. 417, 438 (1998); *see also Chadha*, 462 U.S. at 954. The President does not have—under the Constitution or

otherwise—the power to disregard or act contrary to statutes, even in an emergency. *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952).

The district court correctly found that defendants' actions are likely unconstitutional because defendants "are effectively disabling the Department." (Mem. at 48-50.) As explained (*supra* at 13-14), plaintiffs have put forward extensive evidence—wholly unrebutted by defendants—that defendants are preventing the Department from fulfilling statutory obligations. In addition, defendants are not even attempting to comply with 20 U.S.C. § 3473's express restrictions on the Secretary's authority to reorganize the Department. Indeed, defendants' filings have consistently failed to even mention that statute.

Instead, defendants insist that their actions are merely a streamlining of the Department "for the government to endeavor to operate as efficiently as possible." Mot. at 17. But defendants ask this Court to simply take their word for it, despite all evidence to the contrary. Their effort to depict the RIF and the project to close the Department as two separate things is simply not credible. The President made clear that he believed he could virtually close the Department without Congress (see *supra* at 5-6), and the Department's RIF announcement specifically

stated that terminating half of the Department's workforce was "part of" the "final mission" project. (Ex. 5, at 1.) And the record evidence assembled by plaintiffs, including Doe Declarant 21's declaration (see *supra* at 7-8), shows that high-ranking officials within the Department are acting to wind down department functions, including the functions of terminated employees who performed statutorily mandated roles.

The Department's concession that only Congress can close the Department (Mot. at 1) is correct, but the factual record demonstrates that the Department is nonetheless attempting to dismantle itself. As the district court aptly put it, the lack of evidence that the defendants have done anything to seek congressional approval evokes a teenager who throws a party at home without getting parental permission and justifies it by saying "to the extent that my parents give me permission to, I am throwing this party." (Tr. at 41-42.) A savings clause that would prohibit what the main thrust of a government action purports to do cannot save that action from illegality. *See City & County of San Francisco v. Trump*, 897 F.3d 1225, 1239 (9th Cir. 2018).

## 2. Defendants' actions likely violate the Administrative Procedure Act.

At a minimum, a rational agency action must offer "genuine justifications for important decisions," so that those reasons "can be scrutinized by courts and the interested public." *Department of Com. v. New York*, 588 U.S. 752, 785 (2019). Here, as the district court found (Mem. at 59-60), defendants have offered no explanation for their actions beyond a generalized reference to efficiency, which is at odds with defendants' public statements characterizing the challenged actions as the Department's "final mission" of closure. An "explanation for agency action that is incongruent with what the record reveals about the agency's priorities and decisionmaking process" is inherently arbitrary and capricious. *See Department of Com.*, 588 U.S. at 785.

Moreover, to the extent efficiency is the goal, the existence of the Department *is* an efficiency. As the district court noted (Mem. at 1-2), many of the statutory programs the Department administers preexisted the Department—and Congress streamlined those functions by placing them under a single department. Defendants' actions are arbitrary and capricious because they redistribute those tasks away from statutorily assigned entities—and without any reasoned explanation.

21

The challenged actions also contradict Congress's "mandate that the Department itself must exist—not just in name only, but to carry out the functions outlined in the [organizing act] and other relevant operating federal statutes." (Mem. at 63.) Defendants have not argued that their actions fall within the Secretary's limited restructuring authority under § 3473. Nor could they, as they offer no record to support a finding that the restructuring is "necessary or appropriate" to enable the Department's work under that provision. *See* 20 U.S.C. § 3473(a).

Indeed, in this motion, defendants barely defend the rationality or legality of their actions under the APA. Instead, they argue (Mot. at 18-19) that defendants' actions are not a reviewable final agency action. That argument also is wrong.

A final agency action represents the "consummation" of agency decisionmaking rather than a "merely tentative or interlocutory" position, and is an action "by which rights or obligations have been determined, or from which legal consequences will flow." *U.S. Army Corps of Eng'rs v. Hawkes Co.*, 578 U.S. 590, 597 (2016) (quotation marks omitted). The Supreme Court has urged a "pragmatic" approach to finality, *id.* at 599, holding that an agency action is final if it "for all practical purposes has

22

ruled definitively" on a matter and if that definitive ruling has direct practical consequences, *id.* at 598 (quotation marks omitted).

This standard is easily met here, as the district court recognized. (*See* Mem. at 52-53.) The defendants have made clear that the mass terminations under the RIF will not be reversed, and the terminated employees have been cut off from the ability to do their jobs. Legal consequences flow from defendants' actions because "Agency Defendants have already terminated half of the Department, shut down entire programs and offices, and transferred Congressionally mandated programs out of the Department." (*Id.* at 53.)

## D. The Scope of the Preliminary Injunction Is Appropriate.

Finally, defendants are wrong to contest (Mot. at 19) the scope of the relief ordered by the district court. The purpose of a preliminary injunction is to preserve the status quo, which is "the last uncontested status which preceded the pending controversy," *Braintree Lab'ys, Inc. v. Citigroup Glob. Mkts. Inc.*, 622 F.3d 36, 41 & n.5 (1st Cir. 2010) (quotation marks omitted), and which is not necessarily the status that existed on the date that the complaint was filed, *see Baillargeon v. CSX Transp. Corp.*, 463 F. Supp. 3d 76, 82-83 (D. Mass. 2020) (citing *Braintree*

*Laboratories*). The district court's order is appropriately tailored because it requires the reinstatement of employees only insofar as they were terminated as a part of defendants' improper efforts to close the Department, and is no broader than necessary to redress plaintiffs' harms. The order also does not bar the Department from reorganizing in other ways, such as via the Department's lawful authority under 20 U.S.C. § 3473. (*See* Mem. at 88.)

In arguing that the district court's order exceeds its powers at equity (Mot. at 19), defendants again err, as they did in invoking the CSRA, by relying on personnel cases brought by employees. *See Sampson v. Murray*, 415 U.S. 61, 83-84 (1974). *Sampson* does not hold, as defendants contend, that reinstatement is unavailable in equity. Rather, it holds that equity is traditionally unwilling "to enforce contracts for personal service either at the behest of the employer or of the employee." *Id.* at 83. That principle has no application to a suit by States challenging improper closure of an agency.

## II.   THE REMAINING FACTORS WEIGH STRONGLY AGAINST A STAY.

The remaining factors—irreparable harm, the risk of injury to other parties, and the public interest—all strongly counsel against a stay pending appeal. Where the federal government is a party, the Court's inquiry into the equitable factors and the public interest merges. *See Does 1-6 v. Mills*, 16 F.4th 20, 37 (1st Cir. 2021); *Massachusetts Fair Hous. Ctr. v. U.S. Department of Hous. & Urban Dev.*, 496 F. Supp. 3d 600, 611 (D. Mass. 2020) (citing *Nken*, 556 U.S. at 435).

As set forth above (at 13-14) and in the district court opinion (Mem. at 63-85), plaintiffs have suffered and will suffer irreparable harm from defendants' actions through the increased burden that has already been placed on state resources to investigate civil rights violations that the Department can no longer handle; the deep cuts to Federal Student Aid staff during the peak time of year for FAFSA processing; the virtual elimination of the team that collects data for allocating Title I funds to States; the Department's diminished ability to provide program guidance technical assistance to States; and more.

By contrast, defendants cannot show that the district court's preliminary injunction will cause irreparable harm, and the public

interest favors maintaining the preliminary injunction. Defendants point primarily to a public interest in protecting the executive branch's functions. *See* Mot. at 20. But, under separation of powers principles and the Take Care Clause, the public interest lies in enjoining executive action that violates statutes enacted by the legislative branch. Indeed, plaintiffs' "extremely high likelihood of success on the merits" is a strong indication that preserving the district court's injunction "would serve the public interest." *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016).

Defendants are correct that the "constitutional order" requires policy judgments to be made by the "politically accountable" branches (Mot. at 20), but it is the role of Article III courts to ensure that one of the two political branches does not unlawfully exercise a power that belongs to the other. *See Nebraska*, 600 U.S. at 503, 506-07. Defendants are "correct that this is a case about one branch of government arrogating to itself power belonging to another." *Id.* at 503 "But it is the Executive seizing the power of the Legislature." *Id.* And it is, moreover, part of the constitutional order for States to ask the courts to enjoin such power grabs

when they injure the States or their instrumentalities. *See id.* at 490, 506-07.

Defendants also claim that the Government will be harmed by being required "to continue employing individuals whose services it no longer requires." Mot. at 20. But as the unrebutted record shows, the Department "no longer requires" the employees only because defendants are abandoning their required statutory duties in violation of the law. Moreover, the Government is already compensating all terminated employees until at least June 9 to do no work at all (see *supra* at 7)—undercutting the purported urgency with which the federal defendants have demanded that this Court address their emergency stay motion. *See* Mot. at 22.) To the extent that the defendants' objections are based on the burden of unwinding steps to close the Department already improperly performed, the government cannot "be heard to complain about damage inflicted by its own hand," *Pennsylvania v. New Jersey*, 426 U.S. 660, 664 (1976).

## CONCLUSION

The Court should deny a stay pending appeal.

Dated: May 25, 2025                    Respectfully submitted,

ANDREA JOY CAMPBELL                    LETITIA JAMES
*Attorney General*                     *Attorney General*
*Commonwealth of Massachusetts*        *State of New York*

By: */s/ Nathaniel Hyman*              By: */s/ Matthew W. Grieco*
Katherine Dirks                        Barbara D. Underwood
*Chief State Trial Counsel*            *Solicitor General*
Yael Shavit                            Ester Murdukhayeva
*Chief, Consumer Protection*           *Deputy Solicitor General*
  *Division*                           Matthew W. Grieco
Anna Lumelsky                          *Senior Assistant Solicitor General*
*Deputy State Solicitor*               28 Liberty Street
Elizabeth Carnes Flynn                 New York, NY 10005
Nathaniel Hyman                        (212) 416-8014
Arjun Jaikumar
*Assistant Attorneys General*
1 Ashburton Place
Boston, MA 02108
(617) 963-2277

ANNE E. LOPEZ                          ROB BONTA
*Attorney General*                     *Attorney General*
*State of Hawaiʻi*                     *State of California*

By: */s/ Kalikoʻonālani D. Fernandes*  By: */s/ Lucia Choi*
David D. Day                           Lucia J. Choi
*Special Assistant to*                 *Deputy Attorney General*
  *the Attorney General*               Michael L. Newman
Kalikoʻonālani D. Fernandes            *Senior Assistant Attorney General*
*Solicitor General*                    Srividya Panchalam
Ewan C. Rayner                         James E. Stanley
Caitlin B. Carpenter                   *Supervising Deputy*
*Deputy Solicitors General*              *Attorneys General*
425 Queen Street                       Natasha A. Reyes
Honolulu, HI 96813                     Megan Rayburn
(808) 586-1360                         *Deputy Attorneys General*
                                       300 South Spring Street
                                       Los Angeles, CA 90013
                                       (213) 269-6364

28

KRISTIN K. MAYES
*Attorney General*
*State of Arizona*

By :*/s/ Clinten N. Garrett*
Clinten N. Garrett
*Senior Appellate Counsel*
2005 North Central Avenue
Phoenix, AZ 85004
(602) 542-3333

PHIL WEISER
*Attorney General*
*State of Colorado*

By: */s/ David Moskowitz*
David Moskowitz
*Deputy Solicitor General*
1300 Broadway, #10
Denver, CO 80203
(720) 508-6000

WILLIAM TONG
*Attorney General*
*State of Connecticut*

By: */s/ Michael Skold*
Michael Skold
*Solicitor General*
Patrick Ring
*Assistant Attorney General*
165 Capitol Avenue
Hartford, CT 06106
(860) 808 5020

KATHLEEN JENNINGS
*Attorney General*
*State of Delaware*

By: */s/ Ian R. Liston*
Ian R. Liston
*Director of Impact Litigation*
Vanessa L. Kassab
*Deputy Attorney General*
820 N. French Street
Wilmington, DE 19801
(302) 683-8899

BRIAN L. SCHWALB
*Attorney General*
*District of Columbia*

By: */s/ Andrew Mendrala*
Andrew Mendrala
*Assistant Attorney General*
*Public Advocacy Division*
400 Sixth Street, NW
Washington, D.C. 20001
(202) 724-9726

KWAME RAOUL
*Attorney General*
*State of Illinois*

By: */s/ Sarah A. Hunger*
Jane Elinor Notz
*Solicitor General*
Sarah A. Hunger
*Deputy Solicitor General*
115 S. LaSalle Street
Chicago, IL 60603
(312) 814-4985

29

AARON M. FREY
*Attorney General*
*State of Maine*

By: */s/ Sean D. Magenis*
Sean D. Magenis
*Assistant Attorney General*
6 State House Station
Augusta, ME 04333-0006
(207) 626-8800

ANTHONY G. BROWN
*Attorney General*
*State of Maryland*

By: */s/ Keith M. Jamieson*
Julia Doyle
*Solicitor General*
Keith M. Jamieson
*Assistant Attorney General*
200 Saint Paul Place, 20th Floor
Baltimore, MD 21202
(410) 576-6960

DANA NESSEL
*Attorney General for the*
*People of Michigan*

By: */s/ Neil Giovanatti*
Neil Giovanatti
Kathleen Halloran
*Assistant Attorneys General*
525 West Ottawa
Lansing, MI 48909
(517) 335-7603

KEITH ELLISON
*Attorney General*
*State of Minnesota*

By: */s/ Liz Kramer*
Liz Kramer
*Solicitor General*
Joseph R. Richie
*Special Counsel, Rule of Law*
445 Minnesota Street, Suite 1400
St. Paul, MN, 55101
(651) 757-1010

AARON D. FORD
*Attorney General*
*State of Nevada*

By: */s/ Heidi Parry Stern*
Heidi Parry Stern
*Solicitor General*
1 State of Nevada Way, Suite 100
Las Vegas, NV 89119

MATTHEW J. PLATKIN
*Attorney General*
*State of New Jersey*

By: */s/ Jessica L. Palmer*
Jessica L. Palmer
Andrew Simon
*Deputy Attorney General*
25 Market Street
Trenton, NJ 08625-0093
(609) 696-4607

DAN RAYFIELD
*Attorney General*
*State of Oregon*

By: */s/ Leigh A. Salmon*
Leigh A. Salmon
*Assistant Attorney General*
1162 Court Street NE
Salem, OR 97301
(503) 378-4402

PETER F. NERONHA
*Attorney General*
*State of Rhode Island*

By: */s/ Kathryn T. Gradowski*
Kathryn T. Gradowski
*Special Assistant Attorney General*
150 South Main Street
Providence, RI 02903
(401) 274-4400, Ext. 2810

CHARITY R. CLARK
*Attorney General*
*State of Vermont*

By: */s/ Jonathan T. Rose*
Jonathan T. Rose
*Solicitor General*
109 State Street
Montpelier, VT 05609
(802) 793-1646

NICHOLAS W. BROWN
*Attorney General*
*State of Washington*

By: */s/ Spencer W. Coates*
Spencer W. Coates
*Assistant Attorney General*
Cristina Sepe
*Deputy Solicitor General*
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
(206) 464-7744

JOSHUA L. KAUL
*Attorney General*
*State of Wisconsin*

By: */s/ Charlotte Gibson*
Charlotte Gibson
*Assistant Attorney General*
Post Office Box 7857
Madison, WI 53707-7857
(608) 957-5218

## CERTIFICATE OF COMPLIANCE

I hereby certify that the foregoing document complies with the word limit of Federal Rule of Appellate Procedure 27(d)(2)(A) because the response contains 5,155 words. The document complies with the typeface and type-style requirements of Federal Rules of Appellate Procedure 27(d)(1)(E) and 32(a)(5) and (6) because it has been prepared using Microsoft Word 365 in proportionally spaced 14-point Century Schoolbook typeface.

*/s/ Matthew W. Grieco*
Matthew W. Grieco