No. 25-1495

_____

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIRST CIRCUIT

_____

State of New York, *et al.*,
*Plaintiffs-Appellees*,

v.

Linda McMahon, in her official capacity as Secretary of Education, *et al.*,
*Defendants-Appellants.*

\*\*\*

Somerville Public Schools, *et al.*,
*Plaintiffs-Appellees*,

v.

Donald J. Trump, in his official capacity as President of the United States, *et al.*,
*Defendants-Appellants.*

_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS
No. 25-cv-10601
No. 25-cv-10677
The Honorable Myong J. Joun

_____

**SOMERVILLE PLAINTIFFS-APPELLEES' OPPOSITION TO
DEFENDANTS-APPELLANTS' EMERGENCY MOTION FOR STAY
PENDING APPEAL AND IMMEDIATE ADMINISTRATIVE STAY**

_____

Rachel F. Homer
Elena Goldstein
Victoria S. Nugent
Adnan Perwez
DEMOCRACY FORWARD
FOUNDATION
P.O. Box 34553
Washington, D.C. 20043
(202) 448-9090
rhomer@democracyforward.org
egoldstein@democracyforward.org
vnugent@democracyforward.org
aperwez@democracyforward.org

*Attorneys for Plaintiffs-Appellees*

## INTRODUCTION

If the government is successful in this motion, the Department of Education will cease to exist in the form demanded by its authorizing statute and other congressional mandates. Thus, the government seeks to obtain via an expedited procedural request what it could not obtain on the merits.

There is no dispute that the Secretary of Education and the President want to close the Department of Education and end the federal government's role in education. Their goals are at odds with Congress's directives. Congress has determined that a federal role is essential, has defined specific programs, offices and personnel needed to fulfill that role, and has expressly consolidated those programs, offices, and personnel—supported by annual appropriations—in the Department of Education. Those mandates exist in the Department of Education Organization Act, 20 U.S.C. §§ 3401-3501, and approximately 50 additional statutes.

Nevertheless, on March 11, 2025, as a first step in what the Secretary described as the Department's "final mission," she placed approximately half the Department's work force on administrative leave (the "Mass Termination Order" or "MTO"), which will become final on June 9, 2025. In consequence, services—including those relied on by Plaintiffs—have already been seriously impaired and many offices crucial to those services have been stripped of all personnel.

The Secretary has inverted the usual arc of decision-making, which would typically commence with a plan detailing allocation of resources and how that allocation would meet the Department's programmatic responsibilities. Instead, the Secretary has radically reduced the Department's human resources at the outset, leaving for later any analysis of the MTO's impact on services or to create an plan to continue services.

Had the Secretary proposed Departmental reorganization and reduction of services together with attendant personnel cutbacks, her action would plainly be subject to review under the Administrative Procedure Act ("APA"). A court would evaluate the agency decision and underlying record to determine whether the Secretary had considered relevant factors and whether the plan was consistent with law.

Defendants believe that the government can avoid review of their actions and the consequences by halving the Department with no explanation other than unelaborated references to "efficiency." The district court properly rejected that proposition, stressing that Defendants had not considered any legal constraints or the range of factors relevant to radical Departmental change. Particularly given the President's and the Secretary's repeated declarations of intent to eliminate the Department, basic principles of accountability required the Secretary to explain how the decimation of the work force comports with the statutory "mandate that

the Department itself must exist—not just in name only, but to carry out the functions outlined in [its organic statute] and other relevant operating federal statutes." District Court Opinion ("Op.") 63.

In seeking a stay, Defendants do not suggest that the Secretary considered the impact of the MTO on the Department's operations or its impact on entities such as the Plaintiffs here, which have long partnered with the federal government in seeking to advance common educational goals. They urge, instead, that the decision need not satisfy the requirements of APA review because agency actions involving government employees can only be challenged through the administrative schemes that channel personnel claims through the Merit Systems Protection Board ("MSPB"), which is empowered to review appeals of "final adverse action" within their limited jurisdiction when presented by federal "employee[s], or applicant[s] for employment," and annuitants. 5 U.S.C. § 7701.

Plaintiffs fall into none of those categories, and nothing in the MSPB governing statute suggests that parties independently injured by agency action are deprived of any judicial remedy. Nor does the MSPB have any expertise on the issues presented here.

It is equally clear that the district court properly exercised its discretion in determining that a preliminary injunction was necessary to avoid irreparable injury to Plaintiffs. The district court made extensive findings that establish not only

Plaintiffs' standing but the significant irreparable injury they will experience in absent an injunction.

Defendants' stay application fundamentally misunderstands how school districts, schools, and educators engage with the Department and the harms the MTO is already causing, with more dire effects foreseeable. Federal funds are a critical component of school budgets; technical assistance provided by the Department—on curriculum, pedagogy, technology, and operations—is sought and used by educators and administrators year-round. Continuous dialogue and collaboration between the Department, state education agencies and local school districts and schools enables the timely distribution of funds, guidance, and other resources and support. The MTO has eliminated all or virtually all personnel in offices critical to Plaintiffs' planning and operations. These cuts include the entire staff of the offices that manage the operations of grants and fiscal risk for grants across the Department, and the entire staff that provides policy and legal guidance to states and other grantees about how to implement the Individuals with Disabilities Education Act ("IDEA"), Title I of the Elementary and Secondary Education Act ("Title I") (supporting low-income students, English language learners, rural students and schools, teacher development), the Higher Education Act (providing federal student aid), and numerous civil rights laws enforced by the Office for Civil Rights ("OCR"). *See generally* Op. 8-9 (describing statutory

4

obligations of the Department); *see also* States' Preliminary Injunction Brief ("States' PI Br."), No. 1:25-cv-10601, Doc. 70, at 2-10.[1] The cuts also decimated staffing for the Institute for Education Sciences ("IES"), which gathers essential data, conducts research, and provides technical assistance. Op. 34, 41, 70; States' PI Br. 2-10.

Defendants insist that equitable factors overwhelmingly favor a stay because "[t]he Executive Branch officials responsible for running the Department have determined that the Department can perform its statutory functions with a lower headcount; in our constitutional order, politically accountable Article II actors— not Article III courts—are responsible for making such judgment calls." Gov. Mot. 20. This sweeping claim would be unavailing even if the Secretary had examined the Department's ability to perform its functions with only half its workforce. No such examination ever took place.

The application for a stay should be denied.

## PLAINTIFFS' FACTUAL BACKGROUND

*The Impact of the Mass Termination Order on the Department*

On March 11, 2025, the Department announced the decision to terminate "nearly 50% of the Department's workforce," as "part of the Department of

---

[1] Citations to the record are to No. 1:25-cv-10677 (*Somerville v. Trump*), except where noted to No. 1:25-cv-10601 (*New York v. McMahon*).

Education's final mission." Doc. 27-1. The Department's workforce stood at 4,133 workers on Inauguration Day; after the MTO, the Secretary announced that the staff would number 2,183 workers. *Id.* As the Secretary explained, the approximately 1,300 employees subject to the March 11 MTO were placed on administrative leave on March 21 and will be terminated on June 9, 2025. *Id.*

The following week, President Trump issued Executive Order 14242 directing the Secretary of Education to "take all necessary steps to facilitate the closure of the Department of Education." 90 Fed. Reg. 13679 (Mar. 20, 2025).

While the Secretary's announcement stated that the Department would "continue to deliver on all statutory programs that fall under the agency's purview," it provided no explanation of how it would do so. Although the Secretary declared that the MTO would result in increased efficiency, the Department took no steps to evaluate the impact of the cuts on the programs it administers, including the impact on entities like Plaintiffs. Nor did it assess any alternative means of promoting efficiency while fulfilling its Congressionally mandated responsibilities.

The Secretary's action has functionally gutted multiple offices within the Department, including:

- Firing all attorneys in the Office of General Counsel ("OGC") except those who advise on post-secondary education, including all who

advise on K-12 grants, civil rights, IDEA, and IES. Doc. 27-6
(Leheny) ¶¶ 12-13; PI Br. 12-15 & App.

- Within the Office of Special Education and Rehabilitative Services
  ("OSERS"), which administers IDEA, firing the entire staff that
  provides implementation and guidance to states and other grantees,
  and the entire staff that communicates information to students,
  parents, schools, and states. Op. 24; Doc. 27-8 ¶¶ 21-22 (Neas).

- Within the Office of Elementary and Secondary Education ("OESE"),
  firing key staff and eliminated functions that OESE and offices across
  the Department rely upon. *See* Op. 41 (citing, *inter alia*, No. 1:25-cv-
  10601, Doc. 102-10); PI Br. App.

- Within the Office of Federal Student Aid ("FSA"), firing nearly all
  staff who oversee the FAFSA and application processing for Public
  Student Loan Forgiveness; more than half of the staff in the FSA
  Ombudsman office; six of the eight offices that oversee college and
  university eligibility to receive federal student aid; and nearly all staff
  who oversee student loan data error correction. Op. 74-76; PI Br. App.

- Within IES, nearly all staff. Op. 69-74; PI Brief App. No. 1:25-cv-
  10601, Doc. 71-64.

- All employees within the Office of English Language Acquisition except two. Op. 73; PI Br. App..

- Within OCR, closing more than half of the regional offices firing 55% of all OCR investigators. Op. 79-80; PI Br, 22, 31; No. 1:25-cv-10601, Doc. 71-48 ¶¶ 22, 25-27.

*School District and Union Plaintiffs Depend on the Department for Funding, Technical Support, Guidance, Program Administration, and Enforcement*

Plaintiffs are local school districts and unions that represent educators and paraprofessionals who work in state and local schools. They challenge the MTO as a constructive partial closure of the Department itself, alleging failures to comply with the APA, statutory requirements and limitations of organic statute, and fundamental constitutional separation-of-powers principles.

Through detailed declarations submitted by school district superintendents and union leaders, Plaintiffs have amply demonstrated their reliance on statutorily mandated funding and services that have been crippled by the MTO. *See* Doc. 27-7, 27-9 to 27-15.

School District and Union Plaintiffs depend on federal funds, including Title I and IDEA funding administered by the now-hobbled OSERS and OESE. Federal funding amounts to almost 6% of Somerville's budget, paying for at least 28 staff members (which reduces class sizes), summer programs, services for students with

disabilities, preschool, and more. Op. 29. Easthampton similarly relies on federal funds, largely under IDEA and Title I, to pay for staff, student transportation, and extracurriculars such as athletics, art, and music programs. Op. 30. Union Plaintiffs' members depend on not just the funding itself, but on the *reliable* delivery of federal funding to pay their salaries. Op. 29-30. Federal IDEA funds also pay for assistive technologies that enable Union Plaintiffs' members to effectively communicate with and teach students with disabilities. Op. 30. Federal funds also provide union members with professional development and continuing education opportunities, as well as classroom resources and technology. Op. 30.

The continuity and reliability of federal funding is thus essential for Plaintiffs to fulfill their missions to support students and educators. The Department's role is not simply an annual distribution of funds with nothing further. Rather, funds are distributed throughout the year. For example, IDEA funding is determined in the spring and summer based on data collected by the Department, and then distributed in July and October, Doc. 27-8 ¶ 17 (Neas). Many funds to school districts are distributed throughout on a reimbursement basis, based on federal funds given to States, rather than one-time payments. *See* Doc. 27-7 ¶¶ 41-42 (Carmona). And competitive grant applications (rather than formula grants) are reviewed and funded throughout the year.

Timely distribution of all this federal funding depends on seamless collaboration between the local and state education agencies and staff at the Department. *See* PI Br., Doc. 26, at 10 (citing No. 1:25-cv-10601, Doc. 71-13 ¶¶ 45-46 (Thurmond), 71-22 ¶ 12 (Sanders), 71-31 ¶ 7 (Morton-Bentley)).

The MTO has also decimated offices that provide statutorily mandated technical support, guidance, and enforcement services on which Plaintiffs depend to carry out their missions. As mandated by statute, IES enables school districts and union members to benefit from nationally identified best practices and the latest research on instructional methods, which cannot be recreated locally. *See* PI Brief at 14-15 (citing Doc. 27-7 ¶ 29 (Carmona), Doc. 27-11 ¶¶ 77-79 (McNeil), Doc. 27-14 ¶¶ 10-11 (Wolfson)). Also as required by statute, FSA provides school districts with critical informational resources, such as through FAFSA, to help students prepare for and access higher education. Op. 32; Doc. 27-7 ¶¶ 32-33 (Carmona). Thousands of AFT, AFT Massachusetts, and SEIU members also rely on FSA to fund their own educations and training and identify their best loan repayment options, including through the PSLF program. Op. 32-33; *see also* Doc. 27-11 ¶ 49-50 (McNeil). OCR provides statutorily mandated guidance to School District Plaintiffs on compliance with federal civil rights laws and provides individualized assistance to help Plaintiffs address incidents of racial bias and discrimination. Op. 82-83. Union Plaintiffs'

members similarly rely on OCR's enforcement processes to rectify violations of their and their students' civil rights. *Id.* at 83.

### THE DISTRICT COURT'S DECISION

The district court found, and the record leaves no doubt, that the Secretary halved the Department's work force as a first step in fundamentally dismantling the Department's operations, undermining its Congressionally mandated role of working with parents, states, localities, and educators to achieve common educational goals.

After reviewing the extensive exhibits submitted by the State Plaintiffs and Somerville Plaintiffs, and conducting a hearing, the court granted Plaintiffs' requests for preliminary relief. The court explained that Plaintiffs "have provided an in-depth look into how the massive reduction in staff has made it effectively impossible for the Department to carry out its statutorily mandated functions." Op. 2. The court noted: "The supporting declarations of former Department employees, educational institutions, unions, and educators paint a stark picture of the irreparable harm that will result from financial uncertainty and delay, impeded access to vital knowledge on which students and educators rely, and loss of essential services for America's most vulnerable student populations." Op. 2-3.

The court's opinion examines in detail the impact of the MTO on the Department's ability to meet its statutory duties and similarly details the impact of those failures on Plaintiffs.

## ARGUMENT

### I.    This Court Should Reject Defendants' Motion

A district court's factfinding is given deference unless "clearly erroneous." *Rodriguez-Morales v. Veterans Admin.*, 931 F.2d 980, 981 (1st Cir. 1991). A stay pending appeal is "not a matter of right, even if irreparable injury might otherwise result," and the court considers the four *Nken* factors. *Nken v. Holder,* 556 U.S. 418, 433-34 (2009) (citations omitted).

> ### A. Plaintiffs Are Likely to Prevail on Their Claims that the Mass Termination Order Was Arbitrary, Capricious, and Contrary to Law

Rather than assessing how to achieve the new administration's policy goals consistent with its ability to fulfill the Department's statutory obligations, the Department preemptively dispensed half its workforce, an effective—if unprincipled and chaotic—means of undermining its ability to continue to operate statutorily required programs.

Defendants do not suggest that the Secretary considered the impact of her decision. The district court found that the Secretary "entirely failed to grapple with the potential disruption to operations and interference with statutory and non-

statutory functions a sudden elimination of nearly 50% of the Department's entire workforce would cause." Op. 60 (citation omitted). Nothing in the record indicates a consideration of the "substantial harms and reliance interests for students, educational institutions, Plaintiffs, and others." *Id.*; *see Michigan v. EPA.*, 576 U.S. 743, 753 (2015) ("[R]easonable regulation ordinarily requires paying attention to the advantages and the disadvantages of agency decisions.").

The Secretary's belief that the final agency action falls within her discretion does not remove the obligation to consider the impact of her decision in compliance with the APA. Indeed, an agency has an obligation to consider reliance interests even when it seeks to terminate a program that is outside of its authority. The Supreme Court emphasized in *Department of Homeland Security v. Regents of the University of California*, that "[w]hen an agency changes course, . . . it must 'be cognizant that longstanding policies may have 'engendered serious reliance interests that must be taken into account.'" 591 U.S. 1, 30 (2020) (quoting *Encino Motorcars, LLC* v. *Navarro*, 579 U.S. 211, 222 (2016)). In *Regent*s, the Court stressed that the agency is "required to assess whether there were reliance interests, determine whether they were significant, and weigh any such interests against competing policy concerns." *Id.* That reasoning applies here with even greater force, where the relevant agency programs are required by law.

13

The Secretary was obliged to consider and explain whether and to what extent the cuts would impair the agency's ability to fulfill its statutory responsibilities, as well as to explain how the decimation of the work force comports with "the [Department of Education Organization Act's ("DEOA's")] mandate that the Department itself must exist—not just in name only, but to carry out the functions outlined in the DEOA and other relevant operating federal statutes." Op. 63. Similarly, the Secretary was obligated to consider the extent to which the MTO constitutes a reorganization of the Department and whether that was consistent with statutory limitations on the Secretary's authority to abolish, reorganize, or alter offices, as delineated in the Department's organic act. Op. 56-57; s*ee* 20 U.S.C. § 3473(a)(1)-(3).

Defendants do not even attempt to contend that the Secretary's action satisfies the requirements of the APA. They put no evidence before the district court. They make no attempt now to respond to the district court's extensive factual findings regarding the MTO's impact on the Department's ability to implement statutorily required programs. Nor do they suggest that the Secretary considered any factors that would demonstrate reasoned decisionmaking. Defendants argue, instead, that the MTO is merely a reduction in force, is not final agency action, and that it is reviewable only through administrative review of personnel actions filed by individual employees.

14

These arguments are wrong. The MTO is a final agency action, reviewable by this court under the APA. The MTO is a concrete, final agency action that "mark[s] the 'consummation' of the agency's decisionmaking process" and is an action "by which 'rights or obligations have been determined'" and "from which 'legal consequences [have] flow[ed].'" *Bennett v. Spear*, 520 U.S. 154, 178 (1997) (citations omitted). Reviewing this discrete order is neither "general judicial review of [an agency's] day-to-day operations," *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 899 (1990), nor overseeing "the common business of managing government programs," *Fund for Animals, Inc. v. U.S. Bureau of Land Mgmt.*, 460 F.3d 13, 20 (D.C. Cir. 2006). To hold otherwise would be to turn APA review on its head by transforming agency actions with broad consequences into unreviewable conduct; this is not what the reasoning of *Lujan* and *Fund for Animals* supports.

Defendants repeatedly suggest the Court should not question the Secretary's "judgment [that] the Department's remaining 2,183 employees will be unable to perform the Department's statutory functions." Gov. Mot. 10. But the district court made factual findings that the evidence demonstrates the opposite, and moreover, that the Secretary did not exercise any reasoned judgment, such as consideration of relevant evidence and statutory and regulatory constraints.

Defendants argue that the absence of reasoned decision-making and the evidence of severe programmatic disruption is of no moment because any

employment termination can be challenged only by asserting a claim before the MSPB, which is authorized to review appeals of personnel matters where there is a "final adverse action" presented by federal "employee[s], or applicant[s] for employment," and annuitants. 5 U.S.C. § 7701.

Defendants cannot evade judicial review of their effort to abolish the Department of Education by effectuating that unlawful goal the MTO. The district court correctly recognized Defendants actions for what they are: an attempt to void Congress's mandates. Defendants' attempts to characterize the agency action here as "personnel actions" against federal employees does not accord with either the law or the facts.

*Federal employees* subject to RIFs may bring challenges before the MSPB; and unions representing those employees may bring challenges regarding the labor-management relationship with the agency before the Federal Labor Relations Authority. But this case involves none of those parties or relationships.[2] The MTO has compromised the Department's existence, structure, and ability to fulfil its

---

[2] The only case the government cites involving a plaintiff other than a government employee-—*Block v. Community Nutrition Institute*, 467 U.S. 340 (1984)—involved a Congressional scheme for setting and reviewing prices in a specialized, single commodity market where authority to seek review was limited to market participants.

statutory obligations. As the Supreme Court recently confirmed in *Axon Enterprise, Inc. v. FTC*, such claims are fundamentally *not* claims about personnel actions. *See* 598 U.S. 175, 190-93 (2023) (applying the *Thunder Basin* factors and explaining that challenges to the structure of two agencies should not be channeled to the MSPB because they are far outside of the MSPB's expertise and the MPSB can't provide meaningful review or relief); *accord* Op. 43 ("This case is not about unlawful terminations."). Courts are not required—or permitted—to ignore illegal conduct where it is effectuated through actions related to employees. *See AFGE., AFL-CIO v. Trump*, No. 25-cv-03698, 2025 WL 1482511 (N.D. Cal. May 22, 2025), Doc.124 (granting a preliminary injunction preventing the dismantling of various agencies across the federal government through proposed RIFs and reorganization plans), Order at 2; *NTEU v. Vought,* No. 25-5091 (D.C. Cir. Apr. 28, 2025) (reinstating preliminary injunction that prevented firings at the CFPB); *cf.* Order at 1-2, *U.S. Inst. for Peace v. Jackson*, No. 25-cv-804 (D.D.C. May 19, 2025), Doc. 39 (granting summary judgment for the plaintiffs and ordering return of USIP board and staff).

### B. The Mass Termination Order Is Causing Plaintiffs Concrete, Ongoing, Irreparable Harm

The district court correctly held that Defendants caused Plaintiffs "concrete, imminent harm sufficient to establish standing," and that this harm would be irreparable absent a preliminary injunction. Op. 38, 85. Defendants failed to rebut

Plaintiffs' extensive factual record and raise no new arguments to justify disturbing the district court's conclusions.

First, Defendants' characterization of Plaintiffs' claims as a mere "generalized dispute" about the separation of powers grossly misrepresents the record below. Gov. Mot. 11-12. Defendants broadly assert that Plaintiffs' injuries are akin to those of "[a]ll citizens" who share "an interest in the independence of each branch of Government." *Id.* Here, Somerville Plaintiffs have established that they will be directly and irreparably harmed by illegal interruptions to critical funding and technical assistance—they are nothing like citizens who "roam the country in search of governmental wrongdoing." *F DA v. All. for Hippocratic Med.*, 602 U.S. 367, 379 (2024) (citation omitted).

Second, Defendants cherry-pick words in the district court's opinion to incorrectly assert that Plaintiffs' harms are "plainly speculative." Gov. Mot. 12. But as the district court found, Plaintiffs have produced an "extensive" record— wholly unrebutted by Defendants—showing they are facing harms *now* and that are irreparable if the Mass Termination Order is not enjoined. Op. 42; *id.* at 29-34 (making extensive factual findings as to at least 20 specific harms to Plaintiffs involving funding interruption, funding uncertainty, and loss of technical assistance, financial aid services, and civil rights enforcement); *id.* at 85 ("[A]bsent an injunction, the risk of harm to Consolidated Plaintiffs is immediate and

18

irreparable."). These harms "jeopardize their missions of ensuring an educated citizenry and providing quality education," Op. 84, and translate directly into learning loss for schoolchildren, which can never be undone, *id.* at 67, 73.

Funding Uncertainty and Delays. Because budget decisions must be made months in advance, the Department's gutting of key offices that deliver federal funding to Plaintiffs creates budget uncertainty *right now* for hiring decisions and program planning. Op. 67-69; *see also id.* at 74 (citing Doc. 27-6 ¶ 9 (Binienda) and concluding that cuts to OGC lawyers will impede the ability of the Department to efficiently and correctly deliver federal funds under IDEA and Elementary and Secondary Education Act); *id.* at 31 (finding that cuts to Department staff responsible for administering Title I and IDEA funds will result in funding delays and uncertainty). For example, Somerville and Easthampton do not know whether they can add staff for the 2025-26 school year, whether they can provide summer school, or whether they can even retain their current staff. Doc. 27-7 ¶ 48 (Carmona); Doc. 27-9 ¶ 29 (Binienda); *see also* Doc. 27-10 ¶¶ 14, 40 (Monarrez). Moreover, school districts like Somerville and Easthampton depend on the reliability of federal funds and, as the district court found, "lack sufficient financial resources to weather delays in funding." Op. 68 (citing Doc. 27-7 ¶ 42 (Carmona), Doc. 27-10 ¶ 20 (Monarrez), Doc. 27-9 ¶ 20 (Binienda)). Thus, without funding

certainty, School District Plaintiffs will "be forced to make cuts" and "detrimental changes to programming." Op. 66-67.

As School District Plaintiffs cut programs and lay off teachers, students will face larger class sizes and lose access to educational programs, which will result in irreparable learning loss. *See, e.g.*, Doc. 27-7 ¶ 45 (Carmona) ("Without timely distribution of federal funds, our district will be less effective and students will suffer."); *id.* ¶ 46 ("[A]s students fall behind, it becomes harder to bring them back up."); Doc. 27-9 ¶ 23 (Binienda) ("All of these cuts would have profoundly negative effects on students, staff, and the teaching culture (i.e., pedagogical methods) of the District."). Such harm is irreparable: "even 'a few months can make a world of difference in harm to a child's development.'" Op. 66-67 (quoting *Nieves-Marquez v. Puerto Rico*, 353 F.3d 108, 121-22 (1st Cir. 2003) (cleaned up)). For students, each week, month, semester, and school year hold innumerable—but *time-limited*—opportunities to learn material and skills that depend on cumulative, steady acquisition. For them, there is no holding in place or going back when funding comes through or staffing is restored—even after a delay that might seem brief in government or business.

Loss of Technical Assistance, Guidance, and Enforcement. Defendants' termination of IES, OCR, FSA, OSERS, OGC, and other employees who provide critical technical assistance, guidance, and enforcement is concretely and

irreparably harming Plaintiffs *today*. Plaintiffs rely on IES technical assistance and research to identify and adopt best practices that maximize learning and serve students. Op. 72 (citing Doc. 27-10 ¶¶ 26-31 (Monarrez), Doc. 27-7 ¶ 28-31 (Carmona), Doc. 27-10 ¶ 28, Doc. 27-8 ¶¶ 13-21 (Neas)). But Defendants have destroyed entire offices of IES, rendering them "unable to fulfill their mandates." Op. 69-70.

Union Plaintiffs' members depend on OCR's investigation and complaint procedures to rectify violations of their civil rights, and OCR provides technical assistance and training to School District Plaintiffs that enables them to effectively address discrimination. *See, e.g.*, Doc. 27-9 ¶¶ 31-40 (Binienda) (describing the "staggering difference in terms of parent-teacher communication" due to OCR's assistance in addressing racial bias and discrimination issue in Easthampton high school); *see also* Op. 82-83 (citing Doc. 27-9 ¶¶ 31-34, 38-39 (Binienda); Doc. 27-8 ¶¶ 41-43 (Neas), Doc. 27-11 ¶ 62 (McNeil)). But Defendants have cut OCR investigative staff by over fifty percent, hamstringing its ability to function. Op. 79-80.

Plaintiffs rely on a range of statutorily mandated financial aid services provided by FSA. School District Plaintiffs rely on FSA technical assistance to help students apply for student aid, and Union Plaintiffs' members depend on FSA to afford their educations and repay their student loans. Op. 78-79 (citing Doc. 27-

7 ¶ 33 (Carmona), Doc. 27-10 ¶¶ 32-33 (Monarrez), Doc. 27-12 ¶ 27 (Tang), Doc.

27-13 ¶¶ 18-23 (Ury)). However, the MTO "has resulted in the practical

elimination of most, if not all, essential offices within the FSA." Op. 74. These

specific factual findings plainly deserve credence in contrast to Defendants'

assurances that have no evidentiary support.

Defendants suggest that Plaintiffs are not harmed because Plaintiffs can later

"recover any wrongfully withheld funds through suit in an appropriate forum.'"

Gov Mot. 21. But this ignores the irreparable harms unrelated to funding that

Plaintiffs raise and confuses Plaintiffs' APA claims for injunctive relief with

claims for compensatory damages, which Plaintiffs are *not* making. Indeed, the

harms to Plaintiffs that will inevitably result from funding uncertainty and loss of

technical assistance, guidance, and enforcement cannot later be recompensed.

### C. The Balance of Equities Favors Not Disturbing The District Court's Order

The district court correctly found, based on its extensive factual findings

from the detailed evidentiary record, that the balance of equities favored issuing

the preliminary injunction. Defendants present no compelling reason to disturb this

finding.

Defendants assert that they are irreparably injured by because "Executive

Branch officials . . . have determined that the Department can perform its statutory

functions with a lower headcount," Gov. Mot. 20, and the court's order requires

otherwise, turns a policy preference into an irreparable harm. This is wrong. If the Executive Branch's desire to implement its preferred policy were irreparable harm, then all preliminary injunctions against the government would be stayed pending appeal—turning the legal standard on its head. *See Nken*, 556 U.S. at 433-34 (stay pending appeal is "not a matter of right, even if irreparable injury might otherwise result"); *see also* Gov. Opp. 20. Defendants' assertion that "it can never recover the salaries that it is being ordered to continue paying" is unconvincing, given its failure to account for why these salaries are significant in the context of Department of Education expenditures (which totaled over $268 billion in FY 2024[3]) and the severance terms offered to Education Department employees who accepted the "Fork in the Road" offer, which pays employees for months to not perform work. This Court denied an emergency motion to stay where the government asserted more compelling pecuniary harm from a district court injunction requiring government-wide resumption of grants to states in, *New York v. Trump*, 133 F.4th 51, at 66, 71, 73 (1st Cir. 2025). Finally, Defendants' concern that implementation will pose "extraordinary burdens," Gov. Mot. 20, can be addressed in the regular course through the required status updates and requests to the district court for modifications, as needed.

---

[3] *See* U.S. Dep't of the Treasury, *Final Monthly Treasury Statement* (Fiscal Year 2024), https://fiscaldata.treasury.gov/static-data/published-reports/mts/MonthlyTreasuryStatement_202409.pdf.

Even assuming that this Court were to accept Defendants' representations about the harm they face, it would be necessary, at an absolute minimum, to preserve the status quo as it exists now by precluding the terminations from becoming final on June 9. Failure to do so would create likely insurmountable barriers to any latter attempt to return to the status quo.

## CONCLUSION

The Court should deny Defendants' motion and not allow Defendants to achieve by delay what they cannot achieve on the merits.

Respectfully submitted,

 /s/ *Rachel F. Homer*

Rachel F. Homer
Elena Goldstein
Victoria S. Nugent
Adnan Perwez

*Attorneys for Plaintiffs-Appellees*

May 25, 2025

**CERTIFICATE OF COMPLIANCE**

I hereby certify that on the forgoing Opposition to the Government's

Emergency Motion complies with the word limit of Federal Rule of Appellate

Procedure 27(d)(2)(A) because the motion contains 5,057 words. The opposition

complies with the typeface and type-style requirements of Federal Rule of

Appellate Procedure 27(d)(1)(E) and 32(a)(5) and (6) because it has been prepared

using Microsoft Word version 16 in proportionally spaced 14 point Times New

Roman typeface.

/s/ *Rachel F. Homer*
Rachel F. Homer

**CERTIFICATE OF SERVICE**

I hereby certify that on May 25, 2025, I electronically filed the foregoing

Opposition to the Government's Emergency Motion with the Clerk of the Court for

the United States Court of Appeals for the First Circuit by using the appellate

CM/ECF system. Participants in the case are registered CM/ECF users, and service

will be accomplished by the appellate CM/ECF system.

/s/ *Rachel F. Homer*
Rachel F. Homer