

**U.S. Department of Justice**
Civil Division

---

Tel: 202-305-8648

June 3, 2025

Anastasia Dubrovsky, Clerk
United States Court of Appeals for the First Circuit
1 Courthouse Way, Suite 2500
Boston, MA 02210

RE: *New York v. McMahon*, Nos. 25-1495, 25-1500

Dear Ms. Dubrovsky:

The government respectfully writes in response to plaintiffs' letter of June 2, 2025, which addressed the Ninth Circuit's divided order denying the government's stay motion in *American Federation of Government Employees, AFL-CIO v. Trump*, No. 25-3293 (9th Cir. May 30, 2025).

As set out in Judge Callahan's dissenting opinion, the majority opinion is irreconcilable with Supreme Court precedent on every disputed issue. *See* Dissent at 1-6 (plaintiffs' claims are precluded by the Civil Service Reform Act); *id.* at 6-10 (Executive Branch has constitutional and statutory authority to control the contours of its workforce); *id.* at 10-11 (equities favor the government). The Solicitor General has already asked the Supreme Court to stay the injunction, *see* Application, *Trump v. American Fed'n of Gov't Emps.*, No. 24A1174 (U.S. June 2, 2025), and a copy of the government's application is attached.

Finally, the government appreciates the Court's indication that it will address the government's stay motion in this case "promptly." Order (May 27, 2025). Given the mounting and irreparable harms to the government, we again respectfully request that the Court rule on our motion as soon as possible so that

the government may seek relief from the Supreme Court should the Solicitor
General determine that doing so is warranted.

Sincerely,

/s/ *Steven A. Myers*
Steven A. Myers

cc: all counsel (by ECF)

No. 24A

# In the Supreme Court of the United States

————————

DONALD J. TRUMP, PRESIDENT OF THE UNITED STATES, ET AL., APPLICANTS

*v.*

AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES, AFL-CIO, ET AL.

————————

**APPLICATION TO STAY THE ORDER ISSUED
BY THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
AND REQUEST FOR AN IMMEDIATE ADMINISTRATIVE STAY**

————————

D. JOHN SAUER
  *Solicitor General*
    *Counsel of Record*
  *Department of Justice*
  *Washington, D.C. 20530-0001*
  *SupremeCtBriefs@usdoj.gov*
  *(202) 514-2217*

**TABLE OF CONTENTS**

Statement ............................................................................................... 7

    A.    Federal Government Reductions In Force ............................... 7

    B.    Executive Order 14,210 And The OPM-OMB Memorandum ................ 9

    C.    The Present Controversy ........................................................ 11

Argument ............................................................................................ 14

I.    This Court Should Stay The District Court's Order Enjoining
Implementation Of The Executive Order And Memo ...................... 14

    A.    The Government Is Likely To Succeed On The Merits ...................... 15

        1.    Respondents' claims were not justiciable in district court ....... 15

        2.    Respondents' claims are meritless ..................................... 21

        3.    At a minimum, the injunction is overbroad .............................. 29

    B.    The Remaining Stay Factors Strongly Favor The Government .......... 30

        1.    This Court would likely grant certiorari ..................................... 30

        2.    The district court's order inflicts irreparable harm on the
government and the public interest........................................... 31

II.    An Administrative Stay Is Warranted ............................................ 35

Conclusion ......................................................................................... 35

ii

### PARTIES TO THE PROCEEDING

Applicants (defendants-appellants below) are Donald J. Trump, President of the United States; the Office of Management and Budget; Russell Vought, Director of the Office of Management and Budget; the Office of Personnel Management; Charles Ezell, Acting Director of the Office of Personnel Management; the Department of Government Efficiency; Elon Musk; Amy Gleason, Acting Administrator of the Department of Government Efficiency; the Department of Agriculture; Brooke Rollins, Secretary of Agriculture; the Department of Commerce; Howard Lutnick, Secretary of Commerce; the Department of Defense; Pete Hegseth, Secretary of Defense; the Department of Energy; Chris Wright, Secretary of Energy; the Department of Health and Human Services; Robert F. Kennedy, Jr., Secretary of Health and Human Services; the Department of Homeland Security; Kristi Noem, Secretary of Homeland Security; the Department of Housing and Urban Development; Scott Turner, Secretary of Housing and Urban Development; the Department of Justice; Pam Bondi, Attorney General; the Department of the Interior; Doug Burgum, Secretary of the Interior; the Department of Labor; Lori Chavez-Deremer, Secretary of Labor; the Department of State; Marco Rubio, Secretary of State; the Department of the Treasury; Scott Bessent, Secretary of the Treasury; the Department of Transportation; Sean Duffy, Secretary of Transportation; the Department of Veterans Affairs; Doug Collins, Secretary of Veterans Affairs; AmeriCorps (a.k.a. the Corporation for National and Community Service); Jennifer Bastress Tahmasebi, Interim Agency Head of AmeriCorps; the Environmental Protection Agency; Lee Zeldin, Administrator of the Environmental Protection Agency; the General Services Administration; Stephen Ehikian, Acting Administrator of the General Services Administration; the National Labor Relations Board; Marvin Kaplan, Chairman of the National Labor

iii

Relations Board; William Cowen, General Counsel of the National Labor Relations Board; the National Science Foundation; Brian Stone, Acting Director of the National Science Foundation; the Peace Corps; Allison Greene, Chief Executive Officer of the Peace Corps; the Small Business Administration; Kelly Loeffler, Administrator of the Small Business Administration; the Social Security Administration; and Frank Bisignano, Commissioner of the Social Security Administration.

Respondents (plaintiffs-appellees below) are the American Federation of Government Employees, AFL-CIO; American Federation of State County and Municipal Employees, AFL-CIO; Service Employees International Union, AFL-CIO; AFGE Local 1122; AFGE Local 1236; AFGE Local 2110; AFGE Local 3172; SEIU Local 521; SEIU Local 1000; SEIU Local 1021; Alliance for Retired Americans; American Geophysical Union; American Public Health Association; Center for Taxpayer Rights; Coalition to Protect America's National Parks; Common Defense Civic Engagement; Main Street Alliance; Northeast Organic Farming Association, Inc.; VoteVets Action Fund Inc.; Western Watersheds Project; County of Santa Clara, California; City of Chicago, Illinois; Martin Luther King, Jr. County, Washington; Harris County, Texas; City of Baltimore, Maryland; and City and County of San Francisco, California.

## RELATED PROCEEDINGS

United States District Court (N.D. Cal.):

> *American Federation of Government Employees, AFL-CIO* v. *Donald J. Trump*, No. 25-cv-3698 (May 22, 2025) (granting preliminary injunction)

United States Court of Appeals (9th Cir.):

> *American Federation of Government Employees, AFL-CIO* v. *Donald J. Trump*, No. 25-3293 (May 30, 2025) (denying motion for stay pending appeal)

# In the Supreme Court of the United States

————————

No. 24A

DONALD J. TRUMP, PRESIDENT OF THE UNITED STATES, ET AL., APPLICANTS

*v.*

AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES, AFL-CIO, ET AL.

————————

**APPLICATION TO STAY THE ORDER ISSUED
BY THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
AND REQUEST FOR AN IMMEDIATE ADMINISTRATIVE STAY**

————————

Pursuant to Rule 23 of the Rules of this Court and the All Writs Act, 28 U.S.C. 1651, the Solicitor General—on behalf of applicants Donald J. Trump, President of the United States, et al.—respectfully files this application to stay the May 22, 2025 order issued by the United States District Court for the Northern District of California (App., *infra*, 11a-61a). In addition, the Solicitor General respectfully requests an administrative stay of the district court's order.

In this case, the district court entered a nationwide injunction that bars nearly the entire Executive Branch—19 agencies, including 11 Cabinet departments—from implementing an Executive Order that directs agencies to prepare plans to execute lawful reductions in the size of the federal workforce. That injunction rests on the indefensible premise that the President needs explicit statutory authorization from Congress to exercise his core Article II authority to superintend the internal personnel decisions of the Executive Branch. But "[u]nder our Constitution, the 'executive Power'—all of it—is 'vested in a President,' who must 'take Care that the Laws be

faithfully executed.'" *Seila Law LLC* v. *Consumer Fin. Prot. Bureau*, 591 U.S. 197, 203 (2020) (quoting U.S. Const. Art. II, § 1, Cl. 1; *id.* § 3). Controlling the personnel of federal agencies lies at the heartland of this authority. The Constitution does not erect a presumption *against* presidential control of agency staffing, and the President does not need special permission from Congress to exercise core Article II powers. See *Trump* v. *United States*, 603 U.S. 593, 607-609 (2024).

The district court's injunction violates these bedrock principles and other well-established doctrines. As Judge Callahan explained below, dissenting from the Ninth Circuit's denial of a stay, applicants "have shown a likelihood of success and irreparable harm" with respect to this "sweeping preliminary injunction that strips the Executive of control over its own personnel." App., *infra*, 96a. Plaintiffs improperly "bypass[ed] the comprehensive administrative scheme that Congress has enacted to handle federal sector labor and employment disputes." *Ibid.* And the district court erroneously "concluded that the Executive's actions likely violate separation of powers—without making any finding that any agency's [reduction in force] is likely to violate any statute" and despite the President's constitutional "power over the Executive Branch." *Ibid.*

This Court recently intervened to stop a district court from undoing the effects of the lawful large-scale termination of probationary government employees. See *Office of Personnel Mgmt.* v. *American Fed'n of Gov't Emps.*, No. 24A904 (Apr. 8, 2025). It should take the same course here, where the injunction sweeps far more broadly— to cover most of the federal government—and even restricts the Executive in *planning* personnel actions pursuant to presidential direction. As this Court has recognized, federal courts "do not possess a roving commission" to "exercise general legal oversight of the   * * *   Executive Branch[]," *TransUnion LLC* v. *Ramirez*, 594 U.S.

413, 423-424 (2021)—including its personnel practices. Furthermore, "[i]t clearly is within the President's constitutional and statutory authority to prescribe the manner in which" his subordinates conduct their business, and "this mandate of office must include the authority to prescribe reorganizations and reductions in force." *Nixon* v. *Fitzgerald*, 457 U.S. 731, 757 (1982).

In February, pursuant to his lawful authority to direct executive agencies regarding personnel decisions, President Trump issued an Executive Order directing federal agencies to "promptly undertake preparations to initiate large-scale reductions in force (RIFs), consistent with applicable law," including laws that "mandate[]" the performance of certain "functions" or "require[]" certain agency "subcomponents." App., *infra*, 2a. The President's order rested on firm legal footing and followed a long historical tradition. For at least about 150 years, Congress has recognized the Executive Branch's authority to carry out reductions in its workforce as the need arises, subject to statutory preferences for veteran status and other factors. See 5 U.S.C. 3502; *Hilton* v. *Sullivan*, 334 U.S. 323, 336-339 (1948). The Executive has repeatedly exercised RIF authority. In 1993, for example, President Clinton ordered all federal agencies with more than 100 employees to "eliminate not less than 4 percent of [their] civilian personnel positions" within three years—aiming for a government-wide reduction of 100,000 federal workers. Exec. Order No. 12,839, § 1, 58 Fed. Reg. 8515 (Feb. 12, 1993).

Nearly three months after President Trump issued his order, however, several labor unions, advocacy groups, and local governments (respondents) sued the President, almost every executive department, and other federal defendants (applicants) in the United States District Court for the Northern District of California. They sought to enjoin implementation of the Executive Order and a follow-on memoran-

4

dum (Memo) jointly issued to executive agencies by the Office of Personnel Management (OPM) and the Office of Management and Budget (OMB). The district court quickly granted a universal injunction, first as a putative temporary restraining order (TRO) and then as a preliminary injunction, enjoining applicants from proceeding with any existing or future RIFs pursuant to the Executive Order or Memo, even ones that have no effect on respondents or their members. App., *infra*, 11a-61a. The district court refused to stay its prospective injunctive relief against the Executive Order and Memo, *id.* at 59a, and a divided motions panel of the Ninth Circuit also declined to issue a stay, *id.* at 62a-106a.

This Court should stay the district court's injunction, which suffers from multiple fatal flaws. To start, respondents cannot directly challenge the RIFs for at least four reasons: (1) RIFs are indisputably permitted by federal law, see 5 U.S.C. 3502; (2) the Executive Order directs preparation of RIFs only as "consistent with applicable law," App., *infra*, 2a, an admonition that the Memo repeatedly reaffirmed, see *id.* at 5a; (3) many of the RIFs have not yet been finalized; and (4) any challenges to the RIFs themselves are channeled into specialized administrative and judicial review schemes concerning federal employment under the Civil Service Reform Act, 5 U.S.C. 2301 *et seq.*, and the Federal Service Labor-Management Relations Statute, 5 U.S.C. 7101 *et seq.*, see, *e.g.*, *Elgin* v. *Department of the Treasury*, 567 U.S. 1 (2012).

Facing these obstacles to any direct challenge to the RIFs, respondents have instead manufactured an objection to the Executive Order and Memo that provide direction and guidance about the RIFs. But respondents cannot end-run all those obstacles merely by challenging the Executive Order and Memo instead, for both procedural and substantive reasons.

Procedurally, an objection to the direction and guidance about agency RIFs

that the President and OPM and OMB have provided is also subject to Congress's preclusion of district-court jurisdiction over federal employment and labor-management disputes. See *American Fed'n of Gov't Emps., AFL-CIO* v. *Trump*, 929 F.3d 748, 761 (D.C. Cir. 2019) (applying the same preclusion principle to claims challenging executive orders involving labor-management relations and employee grievances). And regardless, respondents' inability to directly challenge agency RIFs does not entitle them to instead attack the Executive Branch's "whole 'program'" of RIFs by seeking to enjoin implementation of the Executive Order and Memo government-wide. *Lujan* v. *National Wildlife Fed'n*, 497 U.S. 871, 894 (1990); see *id.* at 893 (holding that alleged "flaws in the entire 'program' * * * cannot be laid before the courts for wholesale correction").

Substantively, moreover, the general direction and guidance contained in the Executive Order and Memo are unquestionably lawful. Because "[t]he entire 'executive Power' belongs to the President alone," he must have "'the power of * * * overseeing[] and controlling those who execute the laws'" on his behalf. *Seila Law*, 591 U.S. at 213 (citation omitted). That includes the power to effectuate policy objectives by directing agencies to exercise their statutory authority to conduct RIFs, subject to the guidance of OPM and OMB, so long as it is done in a manner that is fully consistent with law. See *Fitzgerald*, 457 U.S. at 757. The district court turned the constitutional structure upside down by treating as supposed "evidence" of "unlawful action" the mere prospect that "agencies are acting at the *direction* of the President and his team." App., *infra*, 46a.

Equally meritless is the district court's objection that "the President may not, *without Congress*, fundamentally reorganize the federal agencies." App., *infra*, 41a. The Executive Order makes clear that, in proposing RIFs, agencies should ensure

that they do *not* eliminate any "subcomponents" that are "statutorily required" or prevent the performance of "functions" that are "mandated by statute or other law," *id.* at 2a, and the Memo reaffirms that "[a]gencies should review their statutory authority and ensure that their plans and actions are consistent with such authority," *id.* at 5a. The President does not need *additional* statutory authorization to direct agencies to conduct RIFs to further reorganizations within the statutory bounds set by Congress, especially when it is undisputed that the agencies could have done the exact same thing unilaterally. And here, respondents failed to show (and neither court below found) that a single agency's organic statute would be violated by any proposed RIF—much less that any such violation would be traceable to the Executive Order or Memo, rather than to the agency's hypothetical failure to follow the Order and Memo's clear instructions to pursue RIFs in compliance with law.

Exacerbating matters, the district court joined the parade of courts entering improper universal injunctions, extending relief far beyond what was necessary to redress respondents' alleged injuries. It enjoined almost two dozen executive entities, plus anyone acting under the President's authority, from implementing any RIFs pursuant to the Executive Order or Memo, regardless of whether the termination of the employees at issue would have any effect on respondents. App., *infra*, 57a-58a. That abuse of equitable power alone calls for a stay. See *Grupo Mexicano de Desarrollo S.A.* v. *Alliance Bond Fund, Inc.*, 527 U.S. 308, 327 (1999); *Gill* v. *Whitford*, 585 U.S. 48, 66 (2018).

Turning to the equities, the district court's flawed injunction inflicts ongoing and severe harm on the government calling for this Court's intervention. It interferes with the Executive Branch's internal operations and unquestioned legal authority to plan and carry out RIFs, and does so on a government-wide scale. More concretely,

the injunction has brought to a halt numerous in-progress RIFs at more than a dozen federal agencies, sowing confusion about what RIF-related steps agencies may take and compelling the government to retain—at taxpayer expense—thousands of employees whose continuance in federal service the agencies deem not to be in the government and public interest. And although the injunction permits agencies to "engag[e] in their own *internal* planning activities," it hamstrings those efforts by barring the "involvement" of OPM and OMB. App., *infra*, 58a.

Neither Congress nor the Executive Branch has ever intended to make federal bureaucrats "a class with lifetime employment, whether there was work for them to do or not." *Ramspeck* v. *Federal Trial Examiners Conf.*, 345 U.S. 128, 143 (1953). This Court should stay the district court's injunction.

## STATEMENT

### A.    Federal Government Reductions In Force

Federal law expressly recognizes that the government may conduct RIFs, an "administrative procedure by which agencies eliminate jobs and reassign or separate employees who occupied the abolished positions." *James* v. *Von Zemenszky*, 284 F.3d 1310, 1314 (Fed. Cir. 2002). Section 3502 of Title 5 directs OPM to "prescribe regulations for the release of competing employees in a reduction in force." 5 U.S.C. 3502(a). That statute further provides, among other things, for notice of a RIF (generally 60 days) to agency employees and their collective-bargaining representatives, including notice of "any appeal or other rights which may be available." 5 U.S.C. 3502(d)(1)(A) and (2)(E); see 5 U.S.C. 3502(d)(1)(B) and (3) (additionally requiring 60 days' notice to certain state and local entities "if the reduction in force would involve the separation of a significant number of employees"). OPM's detailed and longstanding RIF regulations, 5 C.F.R. Pt. 351, address everything from the order of employee

retention to competition for remaining positions.  The regulations specify that "OPM may examine an agency's preparations for reduction in force at any stage" and require "appropriate corrective action."  5 C.F.R. 351.205.  "An employee who has been furloughed for more than 30 days, separated, or demoted by a reduction in force action may appeal to the Merit Systems Protection Board [MSPB]."  5 C.F.R. 351.901.

That statutory and regulatory scheme reflects Congress's longstanding recognition of federal agencies' authority to engage in RIFs.  The first such statute, enacted in 1876, provided a veterans' preference, requiring any department head "making any reduction in force" to "retain those persons who may be equally qualified who have been honorably discharged from the military or naval service of the United States, and the widows and orphans of deceased soldiers and sailors."  Act of Aug. 15, 1876, Ch. 287, § 3, 19 Stat. 169; see *Hilton* v. *Sullivan*, 334 U.S. 323, 336-339 (1948) (summarizing history of veterans' preferences in RIFs).  Courts have repeatedly rejected challenges to agencies' decisions to conduct RIFs, recognizing that such reductions are a matter of executive discretion.  See, *e.g.*, *Keim* v. *United States*, 177 U.S. 290, 295 (1900) (statute authorizing RIFs "do[es] not contemplate the retention in office of a clerk who is inefficient, nor attempt to transfer the power of determining the question of efficiency from the heads of departments to the courts"); *Markland* v. *OPM*, 140 F.3d 1031, 1033 (Fed. Cir. 1998) (an agency is accorded "wide discretion in conducting a reduction in force") (citation omitted).

As World War II concluded, it was widely understood that the federal government would need to shrink dramatically as the Nation shifted to a peacetime footing.  Congress enacted the forerunner of 5 U.S.C. 3502 in the Veterans' Preference Act of 1944, which directed that "[i]n any reduction in personnel in any civilian service of any Federal agency, competing employees shall be released in accordance with Civil

Service Commission regulations which shall give due effect to tenure of employment, military preference, length of service, and efficiency ratings." Pub. L. No. 78-359, § 12, 58 Stat. 390; see 9 Fed. Reg. 9575 (Aug. 8, 1944) (promulgating Civil Service Commission RIF regulations). In the decades since, the federal government has exercised its authority to conduct RIFs on numerous occasions. In 1993, for example, President Clinton issued an executive order (entitled *Reduction of 100,000 Federal Positions*) that directed "[e]ach executive department or agency with over 100 employees [to] eliminate not less than 4 percent of its civilian personnel positions * * * over the next 3 fiscal years." Exec. Order No. 12,839, § 1, 58 Fed. Reg. 8515 (Feb. 12, 1993). The order required "[a]t least 10 percent of the reductions [to] come from the Senior Executive Service, GS-15 and GS-14 levels or equivalent," and imposed annual benchmarks for the agency RIFs. *Id.* §§ 1, 3.

### B. Executive Order 14,210 And The OPM-OMB Memorandum

1. On February 11, 2025, President Trump issued an Executive Order seeking, like President Clinton's order, to reduce the size of the federal government through RIFs. Exec. Order No. 14,210, 90 Fed. Reg. 9669 (Feb. 14, 2025) (App., *infra*, 1a-3a). The provision of the Executive Order that is most relevant here directs agency heads to "promptly undertake preparations to initiate large-scale reductions in force (RIFs), consistent with applicable law," and in doing so to prioritize RIFs for "offices that perform functions not mandated by statute or other law." App., *infra*, 2a. The Executive Order provides for various exclusions, including for military personnel and "functions related to public safety, immigration enforcement, or law enforcement," and it authorizes further exemptions by agency heads and OPM. *Ibid.* The Executive Order separately addresses agency reorganizations, by directing each agency head to submit a report to OMB that "identifies any statutes that establish the agency, or

subcomponents of the agency, as statutorily required entities" and that "discuss[es] whether the agency or any of its subcomponents should be eliminated or consolidated." *Ibid.*

2.    About two weeks later, OPM and OMB jointly issued a memorandum to all executive-branch agencies regarding the implementation of the President's Executive Order through Agency RIF and Reorganization Plans (Plans). *Guidance on Agency RIF and Reorganization Plans Requested by Implementing the President's "Department of Government Efficiency" Workforce Optimization Initiative* (Feb. 26, 2025) (App., *infra*, 4a-10a).  The Memo provided guidance on the principles that should inform the Plans, including objectives and priorities like providing "[b]etter service for the American people" and "[i]ncreased productivity." App., *infra*, 4a-5a. Furthermore, the Memo repeatedly emphasized the need to comply with statutory mandates in conducting RIFs and reorganizations. See, *e.g.*, *id.* at 5a (urging agencies to "focus on the maximum elimination of functions that are not statutorily mandated while driving the highest-quality, most efficient delivery of their statutorily-required functions" and to "review their statutory authority and ensure that their plans and actions are consistent with such authority").

The Memo directed each agency to submit a "Phase 1" Plan, focusing on "initial agency cuts and reductions," to OPM and OMB for review and approval by March 13, 2025. App., *infra*, 6a. It explained that "[e]ach Phase 1 [Plan] should identify," among other things, "[w]hether the agency or any of its subcomponents should be eliminated or consolidated" and the "specific tools the agency intends to use to achieve efficiencies," such as regular employee attrition or "[a]ttrition achieved by RIFs"—and, as to the latter, "[t]he agency's target for reductions in [full-time] positions via RIFs." *Id.* at 7a.  The Memo further provided that the agency should next submit a "Phase 2"

Plan to OPM and OMB by April 14, 2025, which would "outline a positive vision for more productive, efficient agency operations going forward" and "be planned for implementation by September 30, 2025." *Ibid.* The Phase 2 Plan would address such matters as the agency's "proposed future-state organizational chart" and plans for "subsequent large-scale RIFs." *Id.* at 7a-8a.

### C. The Present Controversy

1.    a.    Respondents are labor unions, advocacy organizations, and local governments. D. Ct. Doc. 1, at 1 (Apr. 28, 2025). Eleven weeks after the President issued the Executive Order, they brought suit in federal district court against the President, OPM, OMB, the U.S. DOGE Service, and 21 federal agencies—including every Cabinet-level agency except the Department of Education. *Id.* at 20-25; see App., *infra*, 20a (noting the subsequent addition of the Peace Corps as a defendant). Respondents alleged that the Executive Order exceeded the President's authority and violated the separation of powers; that the OPM-OMB Memo was likewise *ultra vires* and violated the Administrative Procedure Act (APA), 5 U.S.C. 551 *et seq.*, 701 *et seq.*; and that the agencies' RIF Plans also violated the APA. See D. Ct. Doc. 1, at 94-104. Respondents sought declaratory and injunctive relief against, and vacatur of, the Executive Order, Memo, and Plans. *Id.* at 104-105. They also filed a motion for a TRO. D. Ct. Doc. 37 (May 1, 2025).

b.    The district court held a hearing on May 9, 2025, and issued a putative TRO the same day. D. Ct. Doc. 85. On May 22, after a hearing that day, the court followed the TRO with a preliminary injunction, which generally mirrored the TRO in its scope and reasoning. App.*, infra*, 11a-61a. The court concluded that at least some respondents had standing, *id.* at 23a-28a, and it rejected the government's contention that district-court jurisdiction was precluded by federal statutes channeling

12

these claims related to federal employment to specialized administrative tribunals, see *id.* at 28a-37a.  The court then found that respondents were likely to succeed on at least some of their claims.  It viewed the Executive Order as *ultra vires* because "the President may broadly restructure federal agencies only when authorized by Congress," and Congress here has "passed no agency reorganization law for the President to execute."  *Id.* at 39a, 51a.  The court also deemed it objectionable that "the agencies are acting at the *direction* of the President and his team," rather than making their own independent judgments "about how [they] should conduct RIFs."  *Id.* at 46a.  The court further found the Memo by OPM and OMB unlawful on the ground that those entities lack legal authority to order agencies to terminate their employees or restructure their components.  *Id.* at 44a-45a.  In addition, the court concluded that OPM and OMB "engaged in rule-making without notice and comment required by the APA, in issuing the [Memo] and in approving the [Plans]," and that respondents faced irreparable harm absent injunctive relief.  *Id.* at 54a-56a.

Under the district court's order, OMB, OPM, the U.S. DOGE Service, and 19 agency defendants, as well as anyone else "acting under their authority or the authority of the President," are "enjoined and/or stayed from taking any actions to implement or enforce" the Executive Order or Memo. App., *infra*, 57a-58a.  The enjoined actions "includ[e] but [are] not limited to," among other things, any approval or disapproval of agency RIF Plans and "any further implementation" of those Plans, such as through the issuance or execution of RIF notices and termination of agency employees, "to the extent [such actions] are taken to implement" the Executive Order or Memo.  *Id.* at 58a.  The court added that the enjoined agencies could "engag[e] in their own *internal* planning activities," but only "without the involvement of OMB, OPM, or DOGE."  *Ibid.*  Although the court acknowledged that its order "provide[d]

relief beyond the named plaintiffs," it deemed limiting the relief "impracticable and unworkable." *Id.* at 57a.

The district court further ordered the agency defendants to "rescind any RIFs issued pursuant to Executive Order 14210" and related placements of employees on administrative leave. App., *infra*, 59a. The court stayed that retrospective relief pending appeal, but it otherwise denied applicants' request for a stay of the preliminary injunction. *Ibid.*[1]

2.    Applicants appealed the district court's TRO and sought emergency stay relief from the Ninth Circuit. When the court of appeals failed to timely act, applicants filed an emergency application for a stay in this Court, see Appl., *Trump* v. *American Fed'n of Gov't Emps.*, No. 24A1106 (filed May 16, 2025), but withdrew it when the district court issued the preliminary injunction a week later. Applicants appealed the preliminary injunction to the Ninth Circuit and renewed their motion for a stay.

On May 30, 2025, the Ninth Circuit denied applicants' stay motion by a 2-1 vote. App., *infra*, 62a-106a. In an order by Judge Fletcher, joined by Judge Koh, the panel majority first found that applicants failed to show irreparable injury because the injunction is a "'temporary preservation of the status quo'" and "the money that is being spent" on employees that otherwise would be discharged "has already been

---

[1] The district court included in its May 9 order a directive that OMB and OPM disclose "the versions of all defendant agency [Plans] submitted to" or "approved by" OMB and OPM, "any agency applications for waivers of statutorily-mandated RIF notice periods," and "any responses by OMB or OPM to such waiver requests." D. Ct. Doc. 85, at 40. But the court stayed that order after applicants, invoking the deliberative-process privilege, moved for reconsideration or a protective order and petitioned the court of appeals for a writ of mandamus. D. Ct. Doc. 92 (May 12, 2025). Applicants subsequently withdrew the mandamus petition in light of the district court's actions taken while considering their motion, App., *infra*, 68a n.1, and the discovery dispute remains pending in the district court.

appropriated by Congress." *Id.* at 70a (quoting district court's TRO opinion). The majority further concluded that applicants are not likely to succeed on their jurisdictional objection or their merits defense of the Executive Order and Memo. *Id.* at 71a-93a. The majority emphasized that although it "may be true" that agencies have statutory authority to carry out RIFs, no "federal statute" "authorized the *President* to direct the agencies to do so." *Id.* at 83a. The majority finally found that respondents' asserted harms outweighed the government and public interest in relief from the injunction. *Id.* at 93a-95a.

Judge Callahan dissented. App., *infra*, 96a-106a. She explained, among other things, that respondents' claims "effectively challenge the prospective termination of federal employees in the aggregate," and are accordingly precluded by an exclusive statutory scheme for review of such claims. *Id.* at 97a; see *id.* at 101a n.2 (noting that respondents' APA claim also failed for lack of final agency action). On the merits, Judge Callahan concluded that the Executive Order and Memo "are far from ultra vires" because "the President has the right to direct agencies, and OMB and OPM to guide them, to exercise their statutory authority to lawfully conduct RIFs." *Id.* at 103a. And she emphasized that "the district court failed to analyze and to make findings whether the RIFs likely have resulted or will result in statutory violations." *Id.* at 105a. Finding that the remaining stay factors supported relief, Judge Callahan would have granted a stay of the district court's "expansive" injunction that "interferes in the lawful conduct of a coordinate branch." *Id.* at 105a-106a.

## ARGUMENT

## I.   THIS COURT SHOULD STAY THE DISTRICT COURT'S ORDER ENJOINING IMPLEMENTATION OF THE EXECUTIVE ORDER AND MEMO

To obtain a stay of a preliminary injunction, an applicant must show (1) a like-

lihood of success on the merits, (2) a reasonable probability of obtaining certiorari, and (3) a likelihood of irreparable harm. See *Hollingsworth* v. *Perry*, 558 U.S. 183, 190 (2010) (per curiam). In "close cases," "the Court will balance the equities and weigh the relative harms." *Ibid.* Those factors strongly support relief from the district court's preliminary injunction against implementation of the President's Executive Order and the OPM-OMB Memo.

## A.   The Government Is Likely To Succeed On The Merits

The government is likely to succeed in reversing the injunction on both procedural and substantive grounds. Respondents' claims were not justiciable in district court, and those claims are meritless in any event.

### 1.   Respondents' claims were not justiciable in district court

As a threshold matter, respondents brought their claims in the wrong forum challenging the wrong actions. The district court lacked jurisdiction over this dispute related to federal personnel actions, and respondents lacked a cause of action to challenge White House direction and guidance about plans for future agency RIFs.

a.   "District courts have jurisdiction over civil actions arising under the Constitution and laws of the United States, 28 U.S.C § 1331, but Congress may preclude district court jurisdiction by establishing an alternative statutory scheme for administrative and judicial review." *American Fed'n of Gov't Emps., AFL-CIO* v. *Trump* (*AFGE*), 929 F.3d 748, 754 (D.C. Cir. 2019). Such an alternative scheme displaces district-court jurisdiction if it "displays a 'fairly discernible' intent to limit jurisdiction, and the claims at issue 'are of the type Congress intended to be reviewed within the statutory structure.'" *Free Enter. Fund* v. *Public Co. Acct. Oversight Bd.*, 561 U.S. 477, 489 (2010) (quoting *Thunder Basin Coal Co.* v. *Reich*, 510 U.S. 200, 207, 212 (1994)) (brackets omitted). That test is satisfied here by the Civil Service Reform

Act (CSRA), 5 U.S.C. 2301 *et seq.*, and the Federal Service Labor-Management Relations Statute (FSLMRS), 5 U.S.C. 7101 *et seq.*

i.    The CSRA "establish[s] a comprehensive system for reviewing personnel action taken against federal employees." *United States* v. *Fausto*, 484 U.S. 439, 455 (1988). The statute provides that "[a]n employee * * * may submit an appeal to the Merit Systems Protection Board from any action which is appealable to the Board under any law, rule, or regulation." 5 U.S.C. 7701(a). And by longstanding regulation, "[a]n employee who has been furloughed for more than 30 days, separated, or demoted by a reduction in force action may appeal to the Merit Systems Protection Board." 5 C.F.R. 351.901; see *Alder* v. *Tennessee Valley Auth.*, 43 Fed. Appx. 952, 956 (6th Cir. 2002) (describing a "reduction-in-force decision" as "a fundamental employment claim subject to MSPB review"), cert. denied, 537 U.S. 1112 (2003). The MSPB can order relief to prevailing employees, including reinstatement. 5 U.S.C. 1204(a)(2), 7701(g); see 5 U.S.C. 1214(b) (authorizing the MSPB to issue emergency stay relief). The Federal Circuit has exclusive jurisdiction to review final decisions of the MSPB. 5 U.S.C. 7703(b)(1); see, *e.g.*, *Knight* v. *Department of Def.*, 332 F.3d 1362, 1364 (Fed. Cir. 2003) (RIF demotion claim). The CSRA also includes the FSLMRS, which governs labor relations between the Executive Branch and its employees. See 5 U.S.C. 7101-7135; *AFGE*, 929 F.3d at 752. The Federal Labor Relations Authority (FLRA) is charged with adjudicating federal labor disputes. 5 U.S.C. 7105(a)(2). Congress has authorized review of the FLRA's decisions in the courts of appeals. 5 U.S.C. 7123(a).

This statutory framework precluded the district court from exercising jurisdiction over respondents' claims. At bottom, this case is a dispute concerning "employee relations in the federal sector" and "federal labor-management relations," the subject

matters that Congress enacted the CSRA and FSLMRS to govern. *AFGE*, 929 F.3d at 755 (citations and internal quotation marks omitted). The essence of respondents' suit is a challenge to the legality of preparatory and procedural steps taken by the Executive Branch—principally the President, OPM, and OMB—to plan and facilitate reductions in agency workforces. See App., *infra*, 97a (Callahan, J., dissenting) ("Plaintiffs' claims * * * effectively challenge the prospective termination of federal employees in the aggregate"). Because Congress would not have enacted the "'elaborate' framework" of the CSRA and FSLMRS for reviewing federal-employee terminations and labor disputes, *Elgin* v. *Department of the Treasury*, 567 U.S. 1, 11 (2012) (citation omitted), while allowing an end-run around those procedures in the form of a preemptive district-court action like respondents', the CSRA and FSLMRS statutory scheme evinces a fairly discernible intent to preclude district-court jurisdiction over claims of this nature. See *Free Enter. Fund*, 561 U.S. at 489.

As the district court here admitted, App., *infra*, 30a-32a, numerous courts in recent months and years have applied the same preclusion principle to similar federal-employment suits. See, *e.g.*, *AFGE*, 929 F.3d at 753, 761 (challenge to three executive orders governing collective bargaining and grievance processes); *American Foreign Serv. Ass'n* v. *Trump*, No. 25-cv-352, 2025 WL 573762, at *8-*11 (D.D.C. Feb. 21, 2025) (challenge to employees' placement on administrative leave); *National Treasury Emps. Union* v. *Trump*, No. 25-cv-420, 2025 WL 561080, at *5-*8 (D.D.C. Feb. 20, 2025) (challenge to terminations of probationary employees, anticipated RIFs, and deferred-resignation program); *American Fed'n of Gov't Emps., AFL-CIO* v. *Ezell*, No. 25-cv-10276, 2025 WL 470459, at *1-*3 (D. Mass. Feb. 12, 2025) (challenge to deferred-resignation program); but see *New York* v. *McMahon*, No. 25-cv-10601, 2025 WL 1463009, at *19-*20 (D. Mass. May 22, 2025) (asserting jurisdiction

18

over challenge to Department of Education RIF); *American Fed'n of Gov't Emps., AFL-CIO* v. *OPM*, No. 25-cv-01780, 2025 WL 900057 (N.D. Cal. Mar. 24, 2025) (asserting jurisdiction over challenge to probationary-employee terminations). Respondents' suit is likewise precluded.

ii.    The district court's aberrant jurisdictional analysis was unsound. The court reasoned that precluding respondents' suit would "foreclose meaningful judicial review" because they seek to challenge, on a pre-implementation basis, "'large-scale reductions in force' happening rapidly across multiple agencies." App., *infra*, 33a-34a. But as the D.C. Circuit explained when rejecting a similar argument in *AFGE*, 929 F.3d at 755-756, this Court's decision in *Thunder Basin* held that district-court jurisdiction was precluded by a statutory scheme that did not permit pre-enforcement review at all, see 510 U.S. at 212-216. The prospect that respondents will be unable to "continue business as usual" during the pendency of administrative proceedings, App., *infra*, 34a, does not render meaningful judicial review unavailable, just as it did not do so in *Thunder Basin*. See 510 U.S. at 216-218 (mining company had to give union representatives access to premises or incur civil penalties pending administrative proceedings). The direct harm caused by the challenged conduct—employee terminations in allegedly unlawful RIFs—is remediable, see p. 34, *infra*, and this is precisely the type of conduct that Congress intended to be remedied through the CSRA's processes. In any event, the district court disregarded the statutory authority of "any member" of the MSPB to grant stays pending further proceedings. 5 U.S.C. 1214(b).

The district court further suggested that it was "unlikely" that Congress intended to channel review of RIF claims because "employees' rights to appeal a RIF to the Merit Systems Protection Board come not directly from statute but from regulation," *viz.* 5 C.F.R. 351.901. App., *infra*, 35a; see *id.* at n.14. That reasoning is un-

19

tenable, however, because Congress itself expressly authorized MSPB review of "any action which is appealable to the Board under any law, rule, *or regulation*." 5 U.S.C. 7701(a) (emphasis added). Under the statute's plain terms, the same channeling requirements apply to all such actions, regardless of the particular source of the right to appeal to the MSPB.

The district court and court of appeals also emphasized that respondents raise "fundamental questions of executive authority and separation of powers," "not the individual employee or labor disputes [the MSPB and FLRA] customarily handle." App., *infra*, 33a, 35a-36a; see *id.* at 73a-77a. But this Court has already held that the CSRA channels review of fundamental questions of constitutional law. See *Elgin*, 567 U.S. at 22-23; accord *AFGE*, 929 F.3d at 760-761. For good reason: When the federal government is the employer, practically any employment or labor-management-relations claim can be dressed up in constitutional garb. This case bears no resemblance to those invoked by the court of appeals, in which litigants brought "constitutional challenges" to the "structur[e]" of the relevant administrative tribunals themselves. App., *infra*, 75a (quoting *Carr* v. *Saul*, 593 U.S. 83, 92 (2021)); see *Axon Enter., Inc.* v. *FTC*, 598 U.S. 175, 185 (2023); *Free Enter. Fund*, 561 U.S. at 491.

Finally, the courts below noted that even if the union respondents and their federal-employee members could seek relief under the FSLMRS and CSRA, the other respondents (mainly nonprofits and local governments) could not. App., *infra*, 36a-37a, 77a. This Court, however, has previously rejected a similar attempt to narrow the CSRA's preclusive scope based on the CSRA's limited remedies. See *Fausto*, 484 U.S. at 447-455 (CSRA precluded an employee's suit for backpay despite the unavailability of CSRA review). "[I]t is the comprehensiveness of the statutory scheme involved, not the 'adequacy' of specific remedies," that precludes jurisdiction; accord-

ingly, even where "the CSRA provides no relief," it "precludes other avenues of relief." *Graham* v. *Ashcroft*, 358 F.3d 931, 935 (D.C. Cir.) (Roberts, J.) (citation omitted), cert. denied, 543 U.S. 872 (2004); see *Block* v. *Community Nutrition Inst.*, 467 U.S. 340, 346-347 (1984).  Given that the CSRA precludes federal employees and their unions from themselves going to court even to raise claims or remedies that the CSRA does not recognize, it would be perverse to read the CSRA to permit third parties who are at most "tangentially affected by federal employment decisions to have the right to attack those decisions directly in federal district courts" outside the CSRA process. App., *infra*, 100a-101a (Callahan, J., dissenting) (citing *Filebark* v. *United States Dep't of Transp.*, 555 F.3d 1009, 1014 (D.C. Cir.), cert. denied, 558 U.S. 1007 (2009)).

b.    Regardless of whether the district court had jurisdiction, respondents lack a viable APA or *ultra vires* cause of action to challenge the President's Executive Order and the OPM-OMB Memo in the abstract, divorced from any agency RIFs.  The Executive Order is not agency action subject to review under the APA, because the President is not an agency.  *Franklin* v. *Massachusetts*, 505 U.S. 788, 800-801 (1992).  Nor does the Memo constitute "final agency action" subject to APA review, 5 U.S.C. 704—that is, action "mark[ing] the 'consummation' of the agency's decisionmaking process" and "by which 'rights or obligations have been determined,' or from which 'legal consequences will flow,'" *Bennett* v. *Spear*, 520 U.S. 154, 178 (1997) (citations omitted).  In contrast to agency RIFs themselves, nothing in the Memo finally determines rights or obligations or imposes legal consequences.  See App., *infra*, 101a n.2 (Callahan, J., dissenting).  The Memo merely marks the beginning of an iterative process of engagement with executive agencies, setting forth an internal framework for OPM's and OMB's subsequent "review and approval" of plans for future agency RIFs and reorganizations.  *Id.* at 6a-7a.  The court of appeals' alternative conception

of final agency action would improperly render reviewable any plan or proposal that could be said to "definitive[ly]" initiate an intragovernmental deliberative process. *Id.* at 91a (citation omitted). Indeed, the Memo does not constitute agency action under the APA at all. Instead, it sets forth a framework for preparation and review of proposed agency RIF Plans. Such a general programmatic document is not subject to APA review. See *Lujan* v. *National Wildlife Fed'n*, 497 U.S. 871, 893 (1990).

Furthermore, even assuming that an *ultra vires* action outside of the APA's framework may sometimes be cognizable, respondents' *ultra vires* claim is not. Neither the Executive Order nor the Memo directs agencies to take any actions inconsistent with law. On the contrary, they contain express language doing the opposite, emphasizing the need to comply with applicable law. See App., *infra*, 2a-3a ("consistent with applicable law"); *id.* at 2a (recognizing that RIFs should not prevent the performance of "functions" that are "mandated by statute or other law"); *id.* at 6a ("Agencies should review their statutory authority and ensure that their plans and actions are consistent with such authority."); see also *Building & Constr. Trades Dep't, AFL-CIO* v. *Allbaugh*, 295 F.3d 28, 33 (D.C. Cir. 2002), cert. denied, 537 U.S. 1171 (2003). Insofar as respondents posit that the Executive Order and Memo could not lawfully provide guidance and direction to agencies in their preparation and execution of RIFs, that is plainly erroneous and cannot support an *ultra vires* claim. See *Pennhurst State Sch. & Hosp.* v. *Halderman*, 465 U.S. 89, 101 n.11 (1984) (an "officer may be said to act *ultra vires* only when he acts 'without any authority whatever'") (citation omitted).

## 2. Respondents' claims are meritless

In all events, respondents' claims are fundamentally flawed on the merits. The President's Executive Order and the OPM-OMB Memo rest on firm legal footing, con-

sistent with the long historical tradition recognizing the federal government's authority to conduct RIFs.

a.     The legal bases for the Executive Order and the Memo are straightforward.  As the government explained below, "federal law expressly permits RIFs, the governing statute expressly directs OPM to promulgate regulations governing RIFs, and Congress has consistently recognized agencies' authority to engage in RIFs since the nineteenth century."  App., *infra*, 47a (citation omitted); see 5 U.S.C. 3502; pp. 7-9, *supra*.  Even the district court and court of appeals appeared grudgingly to agree.  See App., *infra*, 47a ("Maybe so."); *id*. at 83a ("to the extent that this may be true * * * ").  That being so, the President unquestionably had the authority to direct agencies to conduct RIFs, consistent with law, in furtherance of his policy objectives and with the guidance of OPM and OMB.  See *id*. at 103a (Callahan, J., dissenting) ("the President has the right to direct agencies, and OMB and OPM to guide them, to exercise their statutory authority to lawfully conduct RIFs").

i.     Consider first the Executive Order.  In addition to the President's own broad statutory authority to oversee and regulate the civil service, see, *e.g.*, 5 U.S.C. 3301, the President is empowered by Article II of the Constitution to supervise and direct agency heads in the exercise of their lawful authority.  "Under our Constitution, the 'executive Power'—all of it—is 'vested in a President,' who must 'take Care that the laws be faithfully executed.'"  *Seila Law LLC* v. *Consumer Fin. Prot. Bureau*, 591 U.S. 197, 203 (2020) (quoting U.S. Const. Art. II, § 1, Cl. 1; *id.*, § 3).  To that end, the President has authority to exercise "'general administrative control of those executing the laws,' throughout the Executive Branch of government, of which he is the head."  *Allbaugh*, 295 F.3d at 32 (quoting *Myers* v. *United States*, 272 U.S. 52, 164 (1926)).  Indeed, this Court has applied this principle specifically in the RIF context.

In *Nixon* v. *Fitzgerald*, 457 U.S. 731 (1982), the Court explained that "[i]t clearly is within the President's constitutional and statutory authority to prescribe the manner in which" his subordinates conduct their business, and "this mandate of office must include the authority to prescribe reorganizations and reductions in force." *Id.* at 757.

Our constitutional structure presumes that federal officers and agencies will be "subject to [the President's] superintendence," *The Federalist* No. 72, at 487 (Alexander Hamilton) (Jacob E. Cooke ed., 1961), and the President concomitantly "bears responsibility for the actions of the many departments and agencies within the Executive Branch," *Trump* v. *United States*, 603 U.S. 593, 607 (2024). Federal agencies depend for their "legitimacy and accountability to the public [on] a 'clear and effective chain of command' down from the President, on whom all the people vote." *United States* v. *Arthrex, Inc.*, 594 U.S. 1, 11 (2021) (citation omitted); cf. Elena Kagan, *Presidential Administration*, 114 Harv. L. Rev. 2245, 2331-2340 (2001). There is thus nothing plausibly unlawful about an Executive Order directing agency heads to "promptly undertake preparations to initiate large-scale reductions in force" consistent with all applicable statutory restrictions. App., *infra*, 2a.

ii.    The Memo is similarly sound. In the main, it provides the agencies with high-level guidance, setting forth principles that agency RIF Plans "*should* seek to achieve," tools that agencies "*should* employ" in developing Plans, and information that Plans "*should* include." App., *infra*, 4a-5a, 7a (emphasis added). To be sure, the Memo also issues directives to agencies, principally by instructing them to submit Plans to OPM and OMB "for review and approval" by specified dates. *Id.* at 6a-7a. But those directives fall comfortably within OPM's and OMB's statutory authorities and the process established by the President in the Executive Order. See *id.* at 102a-103a (Callahan, J., dissenting).

As for OPM, that agency has express statutory authority, as discussed earlier, to "prescribe regulations for the release of competing employees in a reduction in force," 5 U.S.C. 3502(a), and other statutes supplement that authority, see, *e.g.*, 5 U.S.C. 1301 (OPM "shall aid the President, as he may request, in preparing the rules he prescribes under this title for the administration of the competitive service"); 5 U.S.C. 1302(b) (OPM "shall prescribe and enforce regulations for the administration of the provisions of this title, and Executive orders issued in furtherance thereof, that implement the Congressional policy" governing, *inter alia*, preferences for employee "retention"); see also 5 U.S.C. 1103(a)(5)(A) and (c), 1104(b)(2).  OPM exercised those authorities in promulgating detailed, Executive-wide RIF regulations, 5 C.F.R. Pt. 351, whose validity has not been questioned.  Those regulations provide for OPM to "establish further guidance and instructions for the planning, preparation, conduct, and review of reductions in force" and to "examine an agency's preparations for re-duction in force at any stage," 5 C.F.R. 351.205, which squarely encompasses OPM's directives here.  In short, OPM's RIF regulations "mandate a continuing exchange between each agency and the OPM." *National Treasury Emps. Union* v. *Devine*, 733 F.2d 114, 120 (D.C. Cir. 1984).  So in directing agencies to prepare RIF plans, App., *infra*, 2a, the President's Executive Order clearly presumed that agencies should fol-low OPM's guidance.

As for OMB, that office is likewise statutorily authorized to "establish general management policies for executive agencies" and "[f]acilitate actions by  * * *  the executive branch to improve the management of Federal Government operations and to remove impediments to effective administration."  31 U.S.C. 503(b) and (b)(4). Moreover, the Executive Order expressly directs agency heads to submit reorganiza-tion plans to the Director of OMB.  App., *infra*, 2a.

b.    The district court's contrary reasons for enjoining the Executive Order and Memo do not withstand analysis.

Most egregiously, the district court treated as "evidence" of "unlawful action" the prospect that "the agencies are acting at the *direction* of the President and his team" in planning and executing RIFs. App., *infra*, 46a.  Likewise, the court of appeals asserted that the critical question "is not whether Congress has directed the agencies to engage in large-scale reductions-in-force, but whether Congress has authorized the *President* to direct the agencies to do so." *Id.* at 83a; see *id.* at 79a-81a. The lower courts' view turns Article II upside down, for the reasons set forth above. See *Trump*, 603 U.S. at 607; *Seila Law*, 591 U.S. at 203.  The courts articulated no reason why agency RIFs would somehow be exempt from the fundamental constitutional principle that the President, as the repository of the entire executive power, may direct his subordinates in exercising their lawful functions.  See *Fitzgerald*, 457 U.S. at 757.  Contrary to the courts' suggestions, applicants have never denied that agencies are acting at the ultimate "*direction* of the President," App., *infra*, 46a; see *id.* at 79a-80a—that, of course, is the way the constitutional structure is meant to work.  The courts' treatment of such presidential direction as smoking-gun evidence of illegality was deeply mistaken.[2]

The district court and court of appeals also emphasized the President's lack of operative "statutory authority to reorganize the executive branch." App., *infra*, 38a; see *id.* at 39a-42a (discussing historical reorganization statutes); *id.* at 84a-86a

---

[2] The lower courts' attempt to distinguish *Fitzgerald* as speaking only to "the President's military authority," App., *infra*, 43a; see *id.* at 86a, is likewise unfounded. Nothing in that case turned on the President's constitutional authority over the Armed Forces distinct from the rest of the Executive Branch.  In fact, the relevant employee—who was terminated in an allegedly retaliatory RIF—was a civilian.  See *Fitzgerald*, 457 U.S. at 733-734, 756-757.

(same). But a RIF is not a reorganization, which generally refers to an agency restructuring rather than the elimination of positions within an existing agency structure. *Id.* at 2a (Order separately addressing RIFs and reorganizations in Sections 3(c) and (e)); *id.* at 7a (Memo separately addressing RIFs and proposals to "eliminate[] or consolidate[]" agency components). Thus, while a RIF can be conducted *because* of a "reorganization," it can also be conducted for other reasons, such as "lack of work" or "shortage of funds," 5 C.F.R. 351.201(a)(2); see, *e.g.*, 5 U.S.C. 5361(7), which proves that they are distinct forms of action. More fundamentally, neither the Executive Order nor the Memo directs any reorganizations or other actions that would conflict with agencies' statutory mandates. App., *infra*, 2a (order requiring reorganization plans to "identif[y] any statutes that establish the agency, or subcomponents of the agency, as statutorily required entities"); *id.* at 5a-6a. There is nothing unlawful about agency RIFs that facilitate the restructuring of agencies within the organizational bounds imposed by statute.

Unsurprisingly, neither respondents nor the lower courts showed that any ongoing or impending RIFs or reorganizations actually exceed statutory strictures. Respondents offered only conclusory, speculative, and unripe allegations to that effect. See, *e.g.*, D. Ct. Doc. 37-12, at 8 (May 1, 2025) ("There is no possible way that [remaining AmeriCorps employees] can perform the work needed to run this agency in compliance with its statutory duties."). Likewise, the district court said only that it was "not convinced," and had "significant questions," about agencies' "capacities to fulfill their statutory missions." App., *infra*, 50a; see *id.* at 81a (court of appeals similarly raising "questions" about RIFs' impacts on statutory functions) (citation omit-

ted).[3]  Nor did the courts below explain how, even assuming that an agency's RIF might impair its ability to discharge its statutory functions, that would render the RIF itself unlawful, let alone support universally enjoining the implementation of an *Executive Order* that directs agencies to *comply with* their statutory obligations.  That is why the courts were compelled to adopt the untenable position that the contemplated RIFs would be unlawful "even if" they fully comported with agencies' "organic statutory mandates."  *Id.* at 50a; see *id.* at 81a-82a.

The courts below fared no better in emphasizing that the Executive Order contemplates "large-scale" RIFs.  App., *infra*, 46a, 50a, 78a, 83a, 87a; see *id.* at 2a.  Like analogous layoffs in the private sector, RIFs are often large-scale by their nature.  For example, President Clinton's 1993 order of a 100,000-person reduction in the federal workforce was large-scale by any reasonable measure.  See p. 9, *supra*.  And federal law explicitly recognizes that RIFs will sometimes involve "the separation of a significant number of employees."  5 U.S.C. 3502(d)(1)(B); see 5 C.F.R. 351.803(b).  A large RIF that comports with the agency's statutory structure and function is just as lawful as a small one.[4]

---

[3]  As an illustration of the misguided approach taken by the lower courts, the court of appeals highlighted cuts in the Department of Labor's Office of Federal Contract Compliance Programs, App., *infra*, 82a, without recognizing that a principal provision the office was charged with enforcing (a 1965 executive order) was recently revoked.  See Exec. Order No. 14,173, § 3(b)(i), 90 Fed. Reg. 8633, 8634 (Jan. 31, 2025) (revoking Executive Order No. 11,246); *United Steelworkers of Am., AFL-CIO-CLC* v. *Weber*, 443 U.S. 193, 223 n.2 (1979) (Rehnquist, J., dissenting).  This example demonstrates the baselessness of the lower courts' speculation that the RIFs may prevent agencies from complying with their statutory functions.  It also underscores the error of litigating the issue through a government-wide pre-enforcement action.

[4]  The lower courts asserted that President Clinton's order is distinguishable because it contemplated reductions in force through "attrition or early out programs" rather than involuntary separation.  App., *infra*, 43a n.18 (quoting 58 Fed. Reg. at 8515); accord *id.* at 80a.  That distinction makes no difference.  There is no principled basis for limiting presidential authority in this context based on the particular administrative method by which agencies reduce their workforces—consistent with the

The lower courts additionally faulted OPM and OMB for exceeding their authority by unilaterally ordering agencies to carry out RIFs. App., *infra*, 44a-45a, 87a-89a. Yet the Memo shows it does no such thing; instead, it provides guidance to agencies as they, pursuant to the Executive Order, develop their own plans for RIFs and consider changes to their own organizational structures. See *id.* at 4a-10a. The lower courts made much of respondents' claims that, in the course of reviewing and approving RIF plans, OPM and OMB rejected some plans as inadequate. *Id.* at 46a-47a, 88a. But that would in no way mean OPM and OMB are "directing other federal agencies to engage in restructuring and large-scale RIFs." *Id.* at 87a. *The President himself* has "direct[ed] agencies" to do so, and OPM and OMB have "the authorit[y] * * * to guide them" in complying with the President's directive. See *id.* at 103a (Callahan, J., dissenting). If agencies choose not to pursue plans that OPM and OMB have rejected, that is simply because they concur in the assessment that those plans fail to satisfy the President's objectives.

With little analysis, the district court also concluded that OPM and OMB likely "engaged in rule-making without notice and comment required by the APA, in issuing the [Memo] and in approving the [Plans]." App., *infra*, 54a. But in addition to respondents' failure to identify final agency action subject to APA review, see pp. 20-21, *supra*, neither the Memo nor Plan approvals constitute rules under the APA—or, more precisely, under 5 U.S.C. 1103(b), which requires notice for certain OPM rules. See *Fund for Animals, Inc.* v. *United States Bureau of Land Mgmt.*, 460 F.3d 13, 20 (D.C. Cir. 2006) (agency's "planning document * * * is not a 'rule'" under 5 U.S.C. 551(4)); cf. 5 U.S.C. 553(a)(2) (exempting from APA rulemaking procedures "a matter

---

Memo's holistic approach to agency workforce reductions. *Id.* at 7a (contemplating reductions through "[c]ontinuation of the current hiring freeze," "[r]egular attrition," etc.).

relating to agency management or personnel").

### 3. At a minimum, the injunction is overbroad

This Court should independently stay the injunction due to its indefensible scope: it sweeps far more broadly than is necessary or permissible. This Court has repeatedly enunciated the constitutional and equitable principle that relief must be limited to redressing the specific plaintiff's injury. See *Gill* v. *Whitford*, 585 U.S. 48, 66 (2018); *Califano* v. *Yamasaki*, 442 U.S. 682, 702 (1979). Providing relief to non-parties exceeds "the power of Article III courts," conflicts with "longstanding limits on equitable relief," and imposes a severe "toll on the federal court system." *Trump* v. *Hawaii*, 585 U.S. 667, 713 (2018) (Thomas, J., concurring); see *DHS* v. *New York*, 140 S. Ct. 599, 599-601 (2020) (Gorsuch, J., concurring in the grant of stay); Appl. at 15-28, *Trump* v. *CASA, Inc.*, No. 24A884 (Mar. 13, 2023). By the same token, "a court must tailor equitable relief to redress the [plaintiffs'] alleged injuries without burdening the defendant more than necessary." *Department of Educ.* v. *Louisiana*, 603 U.S. 866, 873 (2024) (Sotomayor, J., dissenting in part from denial of applications for stays) (citing *Madsen* v. *Women's Health Ctr., Inc.*, 512 U.S. 753, 765 (1994), and *Yamasaki*, 442 U.S. at 702).

The preliminary injunction contravenes those bedrock principles. The district court openly acknowledged that its order would "provide relief beyond the named plaintiffs," but it claimed that "[t]o do otherwise [is] impracticable and unworkable, in particular considering the diversity of plaintiffs in this case." App., *infra*, 57a. But that approach gets things entirely backwards: It is respondents' burden, not the government's, to justify the scope of the injunctive relief sought and identify those parties that actually face imminent harm absent such relief; and it is up to the government, not the district court, to determine whether complying with a properly limited injunc-

tion is sufficiently unworkable that it should choose to extend broader relief to make it easier to comply. See *Arizona* v. *Biden*, 40 F.4th 375, 398 (6th Cir. 2022) (Sutton, C.J., concurring) ("that is initially the National Government's problem, not ours"). A district court is not relieved of its obligation to tailor injunctive relief merely because plaintiffs choose to bring suit as an unwieldy motley crew with varying indirect interests.

### B.     The Remaining Stay Factors Strongly Favor The Government

This Court's other stay factors also point decisively in favor of staying the district court's injunction against the implementation of the Executive Order and Memo.

### 1.     This Court would likely grant certiorari

The issues presented in this application are worthy of this Court's review under its traditional certiorari criteria. See *John Does 1-3* v. *Mills*, 142 S. Ct. 17, 18 (2021) (Barrett, J., concurring in denial of application for injunctive relief); Sup. Ct. R. 10. This Court has repeatedly intervened—both recently and historically—in cases in which lower courts, like the district court here, have attempted to direct the functioning of the Executive Branch. See, *e.g.*, *Trump* v. *Wilcox*, No. 24A966, 2025 WL 1464804 (May 22, 2025) (per curiam) (granting stay of district-court orders reinstating removed members of executive agencies); *Office of Personnel Mgmt.* v. *American Fed'n of Gov't Emps.*, No. 24A904 (Apr. 8, 2025) (granting stay of district-court order requiring reinstatement of probationary employees); *Department of Educ.* v. *California*, 145 S. Ct. 966, 968-969 (2025) (per curiam) (granting stay of district-court order requiring payment of education grants); *Heckler* v. *Lopez*, 463 U.S. 1328, 1329-1330 (1983) (Rehnquist, J., in chambers) (granting stay of district-court order requiring Secretary of Health and Human Services "immediately to reinstate benefits to the applicants" and mandating that the Secretary then make certain showings "before

terminating benefits"); cf. *Trump* v. *Sierra Club*, 140 S. Ct. 1 (2019) (granting stay of district-court order enjoining the Department of Defense from undertaking any border-wall construction using funding the Acting Secretary transferred pursuant to statutory authority); *INS* v. *Legalization Assistance Project*, 510 U.S. 1301, 1305-1306 (1993) (O'Connor, J., in chambers) (granting stay of district-court order requiring INS to engage in certain immigration procedures, as "an improper intrusion by a federal court into the workings of a coordinate branch of the Government"). And here, the scale of relief granted—encompassing almost the entire federal government—renders this case all the more certworthy.

The district court's novel imposition of limits on the President's ability to control executive agencies in exercising their power over personnel is the same type of important question of federal law that warrants this Court's review. See pp. 22-23, *supra*. Furthermore, the court's analysis of the question of CSRA and FSLMRS preclusion conflicts with the views of several other courts, including the D.C. Circuit. See pp. 17-18, *supra*. That underscores the likelihood that this Court would grant certiorari in this case.

### 2.  The district court's order inflicts irreparable harm on the government and the public interest

The government is also being significantly and irreparably harmed by the preliminary injunction, and those harms outweigh those asserted by respondents.

a.  The injunction strikes at critical governmental interests by barring the implementation of agency RIFs pursuant to the Executive Order and Memo and hampering agencies' control over their own administration. See App., *infra*, 105a-106a (Callahan, J., dissenting). As this Court has observed, "the Government has traditionally been granted the widest latitude" in personnel matters and "the 'dispatch of

its own internal affairs.'" *Sampson* v. *Murray*, 415 U.S. 61, 83 (1974) (citation omitted); see *id.* at 83-84 (discussing "the traditional unwillingness of courts of equity to enforce contracts for personal service either at the behest of the employer or of the employee" and other "factors cutting against the general availability of preliminary injunctions in Government personnel cases"); *National Aeronautics & Space Admin.* v. *Nelson*, 562 U.S. 134, 151 (2011) (noting "the Government's interests in managing its internal operations"). For example, this Court recently recognized the significant "risk of harm" to and "disruptive effect" upon the government presented by orders allowing removed officers to continue "exercising the executive power" pending litigation. *Wilcox*, 2025 WL 1464804, at *1. Applicants likewise have a strong interest in safeguarding the public fisc. See *Mathews* v. *Eldridge*, 424 U.S. 319, 348 (1976). A district-court order broadly barring almost the entire Executive Branch from acting to manage the size of its workforce gravely hinders fundamental governmental interests.

More concretely, the injunction's immediate consequences are stark. The injunction has disrupted and brought to a halt a complex, government-wide effort—which began with the President's Executive Order more than three months ago—to prepare for and execute agency RIFs. It enjoins more than 20 executive-branch entities, and "any other individuals acting under their authority or the authority of the President," from further implementing the Executive Order and Memo, including by carrying out any existing RIF notices or approving and issuing any new RIF notices. App., *infra*, 57a-58a. Dozens of RIF actions affecting thousands of federal employees thus will be delayed and disrupted if the injunction remains in effect. D. Ct. Doc. 1, at 53-67 (Apr. 28, 2025) (complaint describing in-progress RIFs). In fact, this Office has been informed by OPM that about 40 RIFs in 17 agencies were in progress and

are currently enjoined.

The inevitable consequence is to compel federal agencies to keep large numbers of employees on the payroll without necessity, at unrecoverable taxpayer expense, thereby frustrating the government's efforts to impose budgetary discipline and build a more efficient workforce. See App., *infra*, 4a ("The federal government is costly, inefficient, and deeply in debt."); see also, *e.g.*, *Department of Educ.*, 145 S. Ct. 966 (stay granted where TRO permitted potentially unrecoverable drawdowns of $65 million in grant funds); *Heckler* v. *Turner*, 468 U.S. 1305, 1307-1308 (1984) (Rehnquist, J., in chambers) (prospect of the government being forced to make $1.3 million in improper payments per month supported a stay). That Congress appropriated "the money that is being spent as a result of the preliminary injunction," as the court of appeals noted, App., *infra*, 70a, does not mitigate the obvious injury from *unnecessarily wasting* appropriated funds, any more than it did in the cases just cited. And the district court imposed only a token bond of $10 total, based on its far-fetched and question-begging conclusion that "hast[y] and unlawful[]" RIFs will inflict costs comparable to those inflicted by the injunction. *Id.* at 60a.

This Court has expressed concern about the intrusion inflicted by a court order directing the reinstatement of a *single* government employee. See *Sampson*, 415 U.S. at 91-92. It follows that a universal injunction freezing much broader layoffs unquestionably inflicts substantial and irreparable injury on the government as an employer and steward of public funds. Furthermore, the injunction has sown confusion throughout the Executive Branch over what RIF-related actions agencies are permitted to undertake consistent with the order's terms. The caveat that agencies may "engag[e] in their own *internal* planning activities" does not adequately mitigate the problem when paired with a bar against any "involvement" in such activity by OPM

or OMB, App., *infra*, 58a—the executive-branch entities with the experience and expertise, reflected in the statutory and regulatory authorities discussed above, that agencies need to plan RIFs effectively. And the injunction's invitation for applicants to seek "clarification" from the court "about whether certain activities are prohibited or allowed," *ibid.*, merely reinforces the court's improper superintendence of fundamental executive-branch prerogatives. The fiscal and administrative harms inflicted by the injunction amply justify a stay.

b.    Respondents' assertions of irreparable injury do not outweigh applicants'. The district court primarily rested its contrary finding on the prospect of members of respondent unions being subjected to RIFs and laid off. App., *infra*, 23a-24a, 54a-55a. That form of injury is by no means irreparable, however, because employees can seek reinstatement and backpay through the proper channels. See p. 16, *supra*; *Sampson*, 415 U.S. at 91-92 (such injury "falls far short of the type of irreparable injury which is a necessary predicate to the issuance of a temporary injunction in this type of case"); see also *Smith* v. *Department of the Army*, 89 M.S.P.R. 82, 83 (2001) (noting remedial actions for life and health insurance for federal employee reinstated after RIF). That this case implicates more than "one individual employee," as the district court emphasized, App., *infra*, 55a, does not render the exact same type of injury, replicated across a greater population, irreparable.

The district court also cross-referenced its findings with respect to other respondents' Article III standing, in which the court highlighted the possibilities that certain federal contract facilities may close as a result of RIFs, services by federal agencies may be delayed, local-government tax bases may be reduced, and the like. App., *infra*, 24a-27a, 55a; see *id.* at 94a (similar analysis by the court of appeals). Even assuming that those asserted speculative, indirect, downstream harms suffced

for standing (though they do not), irreparable injury for purposes of injunctive relief requires more. See *Monsanto Co.* v. *Geertson Seed Farms*, 561 U.S. 139, 162 (2010). And if the employees who face RIFs are not themselves entitled to injunctive relief as an equitable matter, it would turn equity on its head to grant injunctive relief based on uncertain and remote harms to third parties claiming that they will be indirectly affected by the employees' treatment.

For the foregoing reasons, this Court should stay the district court's May 22 order enjoining the implementation of the Executive Order and the Memo.

## II. AN ADMINISTRATIVE STAY IS WARRANTED

The Solicitor General also respectfully requests that this Court grant an administrative stay of the district court's May 22 order granting a preliminary injunction while the Court considers this application. Every day that the preliminary injunction remains in effect, a government-wide program to implement agency RIFs is being halted and delayed, maintaining a bloated and inefficient workforce while wasting countless taxpayer dollars. In these circumstances, an administrative stay is warranted while this Court assesses the government's entitlement to a stay.

## CONCLUSION

This Court should stay the district court's May 22 order enjoining the Executive Order and Memo. In addition, the Solicitor General respectfully requests an immediate administrative stay of the district court's order pending the Court's consideration of this application.

Respectfully submitted.

D. JOHN SAUER
*Solicitor General*

JUNE 2025